**In re POTASH ANTITRUST LITIGATION.**

**This Document Relates to all Cases.**

**Civil No. 3–93–197/RHK/RLE.
MDL Docket No. 981.**

United States District Court,
D. Minnesota,
Third Division.

Jan. 2, 1997.

Joel C. Meredith, Bruce Cohen, Philadelphia, PA, Mark Reinhardt, Harvey Eckart, St. Paul, MN, for Plaintiff Class.

Richard J. Favretto, Marc Gary, Kerry Lynn Edwards, Washington, DC, Gordon G. Busdicker, Minneapolis, MN, for IMC Fertilizer Group, Inc.

Stephen A. Marshall, Marin P. Michael, New York City, for New Mexico Potash Corp. and Eddy Potash, Inc.

David C. Gustman, Michael Kelly, Chicago, IL, for Noranda Minerals Inc., Noranda Sales Corp., Ltd., and Central Canada Potash Co.

Michael Evan Jaffe, Gerald Zingone, Washington, DC, for PCS.

Gerald A. Connell, Ronald M. Wick, Washington, DC, for Cominco, Ltd., and Cominco American Inc.

Victor S. Friedman, Eric Queen, New York City, for Potash Co. of America, Inc. and Rio Algom, Ltd.

Frank A. Taylor, Kathryn M. Walker, Minneapolis, MN, for PPG Canada Ltd. and PPG Industries, Inc.

Douglas E. Rosenthal, Amy L. Bess, Washington, DC, for Kalium Chemicals, Ltd., and Kalium Canada, Ltd.

Leon R. Goodrich, St. Paul, MN for Cominco, Kalium, Noranda, and PCA.

## *ORDER*

KYLE, District Judge.

Before the Court are Plaintiffs' Objections to the September 13, 1996 Report and Recommendation of Magistrate Judge Raymond L. Erickson recommending that:

(1) the Motion of PCA and Rio Algom for Summary Judgment (Docket No. 512) be granted;

(2) Kalium's Motion for Summary Judgment (Docket No. 516) be granted;

(3) Noranda's Motion for Summary Judgment (Docket No. 519) be granted;

(4) Cominco's Motion for Summary Judgment (Docket No. 522) be granted;

(5) the Joint Motion of the Defendants for Summary Judgment (Docket No. 525) be granted;

(6) IMC's Motion for Summary Judgment (Docket No. 527) be granted;

(7) PPG's Motion for Summary Judgment (Docket No. 530) be granted; and

(8) the Motion of New Mexico Potash and Eddy Potash for Summary Judgment (Docket No. 534) be granted.

The Court has made a de novo determination of those portions of the Report and Recommendation to which Objections have been made. In doing so, the Court has reviewed the entire file, the Motions for Summary Judgment and supporting and opposing briefs, the proceedings before Judge Erickson, the Report and Recommendation of Judge Erickson, the Objections with respect thereto, the briefs in support of and in opposition to said Objections, and the oral argument of counsel in the hearing held before the undersigned on December 20, 1996. The Report and Recommendation is thorough and well reasoned. In the Court's view, it correctly analyzes and resolves the issues presented by the Motions for Summary Judgment and the Objections now before the Court. No useful purpose would be served by this Court repeating the analysis here. The Court concurs with the determinations of Magistrate Judge Erickson and will adopt the Report and Recommendation in its entirety.

Accordingly, based upon a de novo review of the Objections and upon all the files, rec-ords, and proceedings herein, the Report and Recommendation of Magistrate Judge Erickson dated September 13, 1996 is **ACCEPTED** and **ADOPTED,** and

**IT IS ORDERED** that:

(1) the Motion of PCA and Rio Algom for Summary Judgment (Docket No. 512) is **GRANTED;**

(2) Kalium's Motion for Summary Judgment (Docket No. 516) is **GRANTED;**

(3) Noranda's Motion for Summary Judgment (Docket No. 519) is **GRANTED;**

(4) Cominco's Motion for Summary Judgment (Docket No. 522) is **GRANTED;**

(5) the Joint Motion of the Defendants for Summary Judgment (Docket No. 525) is **GRANTED;**

(6) IMC's Motion for Summary Judgment (Docket No. 527) is **GRANTED;**

(7) PPG's Motion for Summary Judgment (Docket No. 530) is **GRANTED;** and

(8) the Motion of New Mexico Potash and Eddy Potash for Summary Judgment (Docket No. 534) is **GRANTED.**

Pursuant to the foregoing, Plaintiffs' Third Amended and Consolidated Class Action Complaint (Docket No. 249) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 13th day of September, 1996.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A) and (B), upon the Motions of the Defendants for Summary Judgment.[1]

---

1. In addition to the filing of a Joint Motion and Memorandum in Support of Summary Judgment, the Defendants—with the exception of Potash Corporation of Saskatchewan, Inc. and Potash Corporation of Saskatchewan Sales Limited (collectively "PCS")—filed Supplemental Motions for Summary Judgment, which separately addressed those issues that were unique to each, individual Defendant.

A Hearing on the Motions was conducted on April 18, 1996, at which time the parties appeared by lead and liaison counsel.[2]

For reasons which follow, we recommend that the Defendants' Motions for Summary Judgment be granted.

## II. Factual and Procedural Background

This action was commenced on April 1, 1993, when the first of twelve Complaints was filed in this Court, alleging that the Defendants had violated Section 1 of the Sherman Act, *Title 15 U.S.C. § 1*, by engaging in a conspiracy to fix the sales price of potash, a mineral that is widely used in the manufacture of fertilizers.[3] On May 19, 1993, the District Court, the Honorable Richard H. Kyle presiding, directed the parties to file an Amended Consolidated Class Action Complaint which would combine the twelve separate proceedings.[4]

The Plaintiffs' First Amended Consolidated Class Action Complaint was filed on June 4, 1993. Thereafter, the Defendants informed the Court that Keith Barton ("Bar-

ton"), who had previously served as the General Counsel to PCS, had furnished counsel for the Plaintiffs with confidential information about PCS, which Barton had acquired as legal counsel to that company. By Order dated December 8, 1993, the District Court concluded that Barton had breached his ethical obligations, by impermissibly disclosing certain of PCS's confidences. As a necessary, remedial sanction, the District Court disqualified the bulk of the counsel, who had then been retained by the Plaintiffs, and whose capacity, to ethically serve in this litigation, had been irreconcilably compromised by their involvement with Barton, and directed the Plaintiffs to file Amended Complaints which would be free from the taint of Barton's disclosures. See, *In re Potash Antitrust Litigation*, Civ. No. 3-93-197, M.D.L. Docket No. 981, 1993 WL 543013 (D.Minn., December 8, 1993).

In a Third Amended Complaint, which was served and filed on July 8, 1994, the Plaintiffs have alleged that the Defendants conspired, from April of 1987, to and including July 8,

---

**2.** Appearances were as follows: the Plaintiff Class appeared by Joel C. Meredith, Bruce Cohen, Mark Reinhardt, and Harvey Eckart, Esqs.; Richard J. Favretto, Marc Gary, Kerry Lynn Edwards, and Gordon G. Busdicker, Esqs., appeared on behalf of IMC Fertilizer Group, Inc. ("IMC"); Stephen A. Marshall, and Martin P. Michael, Esqs., appeared on behalf of New Mexico Potash Corporation, and Eddy Potash, Inc. (collectively "NMP/Eddy"); David C. Gustman, and Michael Kelly, Esqs., appeared on behalf of Noranda Minerals Inc., Noranda Sales Corporation, Ltd., and Central Canada Potash Company, Limited (collectively "Noranda"); Michael Evan Jaffe, and Gerald Zingone, Esqs., appeared on behalf of PCS; Gerald A. Connell, and Ronald M. Wick, Esqs., appeared on behalf of Cominco, Ltd., and Cominco American Incorporated (collectively "Cominco"); Victor S. Friedman, and Eric Queen, Esqs., appeared on behalf of Potash Company of America, Inc. ("PCA"), and Rio Algom, Limited ("Rio Algom"); Frank A. Taylor, and Kathryn M. Walker, Esqs., appeared on behalf of PPG Canada Limited and PPG Industries, Inc. (collectively "PPG"); Douglas E. Rosenthal, and Amy L. Bess, Esqs., appeared on behalf of Kalium Chemicals, Ltd., and Kalium Canada, Ltd. (collectively "Kalium"); and Leon R. Goodrich, Esq., appeared on behalf of Cominco, Kalium, Noranda, and PCA.

**3.** "Potash" is a generic name for a variety of potassium forms. The potassium found in potash, together with nitrogen and phosphorus,

constitute the three basic raw materials used in the production of fertilizers. The predominant form of potash is "muriate of potash," which is otherwise known as "potassium chloride." Muriate of potash, which constitutes nearly all of the potash consumed in the United States, is available in three varieties of particle size: standard, coarse, and granular. *Plaintiffs' Third Amended and Consolidated Class Action Complaint* ("Third Amended Complaint") at ¶ 36. In addition to its employment as a fertilizer, a small portion of potash is consumed in various industrial applications. Potash is typically mined from underground land deposits, either through conventional or through "solution" mining. The potash, that is produced through solution mining, is white in color, whereas the potash, that is mined through conventional means, is typically red. Only white potash is suitable for industrial uses. *Expert Report of Andrew W. Rosenfield* ("Rosenfield Rept.") at ¶ 59, attached as *Exhibit 17, Defendants' Joint Memorandum in Support of Summary Judgment, Affidavit of Gordon Busdicker* ("Defs.' Jt.Memo.Aff.").

**4.** On August 19, 1993, the Judicial Panel on Multidistrict Litigation transferred to this Court, in order that they might be consolidated with the twelve actions that this Court had previously combined, certain proceedings, which had originated in the District Courts for the Northern District of Illinois, and for the Western District of Virginia, and which involved the same or similar issues.

1994, to fix, stabilize, and maintain potash prices, and that, as a result of that conspiracy, price competition in the sale of potash, among the Defendants and their co-conspirators, had been restrained. Specifically, the Plaintiffs have asserted that the Defendants, and their co-conspirators, raised, fixed, maintained and stabilized the price of potash throughout the United States, at artificially high and noncompetitive levels, thereby depriving their customers of the benefit of free and open competition. *Third Amended Complaint* at ¶ 55. The Plaintiffs seek injunctive relief and the recovery of treble damages, together with their costs and attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, *Title 15 U.S.C. §§ 15 and 26.*

Included within the Plaintiff Class are all of those persons, who directly purchased potash from one of the Defendants, during the period of the alleged conspiracy. Accordingly, by Order dated January 12, 1995, the District Court certified the following class of Plaintiffs:

> All purchasers (excluding governmental entities, defendants, subsidiaries and affiliates of defendants, co-conspirators of defendants, and other producers of potash and their subsidiaries and affiliates) in the United States of potash directly from defendants or any subsidiary or affiliate thereof at any time during the period April 1987 to and including July 8, 1994.

*In re Potash Antitrust Litigation,* 159 F.R.D. 682, 700 (D.Minn.1995).

By Order dated May 2, 1995, the Court drafted, for distribution, a Notice which was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Potash Antitrust Litigation,* 161 F.R.D. 411, 412 (D.Minn.1995). Insofar as we are aware, the Court-sanctioned Notice was published, and was mailed, in accordance with our directions, on or about June 30, 1995.

With the exception of PPG and Rio Algom, the Defendants are either Canadian or American producers of potash, or are the marketing subsidiaries of those producers.[5] Although the attributes, which are said to distinguish the Defendants, will be addressed when relevant to our subsequent analysis, a brief discussion of the potash market will provide a helpful backdrop.

PCS, which is the largest producer of potash in North America, was created, in 1975, by the Saskatchewan Government, and was vested with the authority to acquire up to 50 percent of the productive capacity for potash in that Province. In 1989, PCS was privatized—a process that the Defendants assert was initiated in the latter part of 1986—with the result that a change in its merchandising was introduced, from one of production to one of profit. Kalium, which is another Canadian producer of potash, contends that, during the period of the alleged conspiracy, it was able to increase its market share by exploiting the superiority of its product—white potash—through a patented method of solution mining. Noranda's marketing plan, on the other hand, is somewhat distinguishable, since 80 percent of its sales are consummated with only two customers, whose purchase agreements have required that Noranda sell its potash at the market price. In

---

5. As to PPG and Rio Algom, their involvement in the sale of potash, in the United States, arises from their ownership of one or more of the co-Defendants. For example, until November of 1987, PPG owned and operated Kalium as a business unit. *PPG's Memorandum in Support of Summary Judgment ("PPG Memo.")* at 1. On August 20, 1987, PPG agreed to sell its interest in Kalium to S & P Canada, Ltd. and S & P U.S., Inc. (collectively "S & P"), and that transaction was completed on November 17, 1987. *Id.* at 1 n. 1. Rio Algom, on the other hand, acquired, in 1986, the Potash Company of America, Inc. ("PCA Canada"), which is a Canadian company that operated two Canadian potash mines, and that merchandised potash in the United States.

*Declaration of John A.H. Bush* at ¶ 2, attached to *PCA's and Rio Algom's Memorandum in Support of Summary Judgment ("PCA/Rio Algom Jt. Memo.")*. PCA Canada operated as a wholly-owned subsidiary of Rio Algom until December 31, 1987, when Rio Algom created a division ("Division") which oversaw the operations of the two mines. *Id.* at ¶ 3. On that same date, Rio Algom transferred the responsibility, for the sale and marketing of potash in the United States, to PCA, which operated as a wholly-owned subsidiary of Rio Algom. *Id.* at ¶ 4. Thereafter, in October of 1993, PCA's assets, and the potash mining assets of the Division, were sold to PCS. *Id.* at ¶ 5.

contrast, PCA's marketing in the United States has been less successful than that of the other Defendants, as is reflected in its dwindling market share, from approximately 8 percent, in 1986, to 1.3 percent, in 1993, see, *PCA/Rio Algom Jt. Memo.* at p. 6, as well as by its resort to purchasing potash from a co-Defendant, as a result of the loss of its mine, in February of 1987, to flooding. The remaining Canadian producers include Cominco and IMC, while New Mexico Potash ("NMP"), and Eddy Potash, are the only Defendants who are located in the United States.

The Plaintiffs contend that, after PCS increased its potash prices, in April of 1987, the other producers—acting in concert—followed suit by increasing their prices. *Third Amended Complaint* at ¶ 50. According to the Plaintiffs, this same pattern of pricing continued throughout the remainder of 1987; so that, by the beginning of 1988, price increases for potash had exceeded 74 percent. *Id.* at ¶ 51. Since the Third Amended Complaint has principally focused upon this particular period of time, a brief overview of the potash industry, together with a recitation of what appear to have been the key operative events which led up to January of 1988, will provide some additional context for the discussion that follows.

The North American potash industry is, and has been, highly concentrated. For example, in the 1985/1986 fertilizer year,[6] the Defendants comprised over 80 percent of the productive capacity for potash in North America. *Expert Report of Gordon C. Rausser ("Rausser Rept.")* at ¶ 12, attached as

*Tab 59, Plaintiffs' Joint Brief in Opposition to Summary Judgment, Affidavit of Harvey H. Eckhart ("Pltfs.' Jt.Opp.Aff.").* By the 1993/1994 fertilizer year, the Defendants' productive capacity had increased to over 90 percent. *Id.*

In addition to the limited number of producers who serve the potash market, it is significant that potash is an essentially homogeneous product, with the result that its purchasers largely consider the output, from different producers, to be interchangeable. *Id.* at ¶ 7. Moreover, the demand for potash is inelastic—that is, a decrease in the price of potash will not necessarily lead to a comparable increase in consumption—principally because potash is primarily employed in agricultural uses, where it has no effective substitute, and where it is inexpensive in relation to the total cost of crop production. *Id.* at ¶ 10.

As a result of the fungibility of potash, the inelasticity of the demand for the product, and the relatively small number of potash producers, the industry operates in an oligopolistic market, which causes the market participants to be "interdependent." Put simply, "[o]ne firm's actions are interdependent with those of another when their utility depends on the other firm's response." VI P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1411, at 70 (1986) (hereafter "VI Areeda"). As a consequence, in an oligopoly, each producer is generally required to account for the conduct of its competitors, when pricing its product, as the oligopolist cannot, unilaterally, maintain a higher price without losing its market share.[7]

---

**6.** The "fertilizer year" runs from July 1 through June 30. *Expert Report of Louis A. Guth* at ¶ 9 n. 7 ("The crop year runs from July 1 through June 30."), attached as *Exhibit Q, NMP/Eddy Memorandum in Support of Summary Judgment, Affidavit of Steven A. Marshall ("NMP/Eddy Jt. Memo.Aff.").*

**7.** The mechanics at play here, in the context of a concentrated industry, were succinctly recounted by then Circuit Judge, and now Justice Breyer, as follows:

> A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader. After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply

lead competitors to match the lower price, reducing profits for all. One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry. *Clamp-All Corp. v. Cast Iron Soil Pipe Institute,* 851 F.2d 478, 484 (1st Cir.1988); see also, *United States v. FMC Corp.,* 306 F.Supp. 1106, 1139 (E.D.Pa.1969) ("[D]ue to the relative inelasticity of demand for the products a lower price will not increase the size of the total market; no producer can successfully sell at a higher price than its competitors; and if a seller attempts to sell at a lower price * * * its competitors will be given the opportunity to meet its lower price, thereby resulting in uniform prices again, but at a lower level; and without any increase in the original

As alleged in the Third Amended Complaint, "[b]y the 1980's, the potash industry was faced with a major oversupply situation, coupled with high fixed costs, leading to major losses for the producers." *Third Amended Complaint* at ¶ 45. This circumstance of oversupply has been attributed, in part, to a miscalculation of the demand for potash, which declined, in the early 1980's, as the acreage under cultivation decreased in the United States, and as a result of a strategy on PCS's part, as a state-owned employer, to increase employment opportunities in Saskatchewan. See, e.g., Haglund & von Bredow, *The Politics of Antidumping: The Potash "War" of 1986–1988*, in U.S. Trade Barriers and Canadian Minerals: Copper, Potash and Uranium (1990), p. 66, attached as *Exhibit 5, Defs.' Jt.Memo.Aff.*; *PCS 1981 Annual Report (PC 420978)*, attached as *Exhibit 14, Defs.' Jt.Memo.Aff.* The decline in the demand for potash, combined with the increase in production to stimulate a "price war." By October of 1986, the real price of potash had fallen to historically low levels. Indeed, the Defendants' expert, Andrew M. Rosenfield ("Rosenfield"), has calculated that, in real price terms, the price of potash, in October of 1986, was 21 percent lower than the previous historical low. *Rosenfield Rept.* at ¶ 76, attached as *Exhibit 17, Defs.' Jt.Memo.Aff.* Notably, on three separate occasions in 1986, Noranda, Kalium, PCA, and PCS attempted to unilaterally increase prices, but they were forced to rescind the increases when the prices went unmatched. *Defs.' Jt.Memo.* at 5; *Pltfs.' Jt.Opp.Memo.* at 3 and 45.

The effect of these low price levels, in an oversupplied market, caused record losses at PCS. In March of 1987, the Provincial Government replaced the upper level of management at PCS with a team led by Charles Childers ("Childers") and William Doyle ("Doyle"), both of whom had previously been employed at IMC.[8] Childers served as PCS's president and CEO, while Doyle became the president of PCS's sales subsidiary.

In assuming leadership at PCS, Childers sought to make the operations profitable, in part, in order to prepare the company for privatization, which ultimately occurred in November of 1989. To accomplish the goal of profitability, Childers aspired to position PCS as a leader in the industry. See, e.g., "Tough Decisions Return Balance to the Bottom Line," *Custom Applicator*, Feb. 1989, attached as *Exhibit 24, Defs.' Jt.Memo.Aff.*

Against this background of falling prices and, contemporaneous with the change in PCS's management, on February 10, 1987, two American potash producers, Lundberg Industries ("Lundberg") and NMP, petitioned the United States Department of Commerce ("DOC") to initiate an antidumping proceeding against the Canadian producers. In order for an antidumping action to proceed, the United States International Trade Commission ("ITC") has to preliminarily establish that there was a "reasonable indication" that an industry in the United States was being materially injured by reason of imports which are, assertedly, being sold in the United States at less than their fair market value. See, *Title 19 U.S.C. § 1673b(a)*. On March 27, 1987, the ITC determined that a "reasonable indication" had been shown that the United States potash industry had suffered a material injury because of imports. *Potassium Chloride From Canada*, 52 Fed.Reg. 10641 (April 2, 1987), attached as *Exhibit 31, Defs.' Jt. Memo.Aff.* Thereafter, the investigation returned to the DOC, which preliminarily determined, on August 21, 1987, that imports of potash were being sold in the United States at "less than fair value." *Potassium Chloride From Canada: Preliminary Determination of Sales at Less than Fair Value*, 52 Fed.Reg. 32151 (August 26, 1987), attached as *Exhibit 32, Defs.' Jt.Memo.Aff.*

Based upon this preliminary finding, the DOC ordered the Canadian producers to pay cash deposits, on all future exports to the United States, or to post bonds, that would

---

seller's net share of the market."), order supplemented, 317 F.Supp. 443 (E.D.Pa.1970).

**8.** The ensuing portions of this Report are unavoidably rife with the *dramatis personae* of the potash industry, as it existed during the period of the alleged conspiracy. For ease of reference, we append to this Report a listing of the identities of those persons whose names reoccur in our discussion of the issues. See, *Appendix A*.

be equal to the amount by which the Canadian producers were determined to be selling below fair market value—otherwise known as the "dumping margin." *Id.* at 32154 ("The Customs Service shall require a cash deposit or the posting of a bond equal to the estimated amounts by which the foreign market values of potassium chloride exceed the United States price."). A separate dumping margin was calculated for each producer, based upon fair value comparisons of that producer's sales to the United States, during the period from September 1, 1986, through February 28, 1987. *Id.* The dumping margins were established, as follows:

| | |
|-------|--------|
| IMC | 9.14% |
| Kalium | 6.67% |
| PCS | 51.9% |
| PCA | 77.4% |
| Noranda | 85.2% |
| All Others | 36.6% |

*Id.* In general terms, IMC and Kalium were determined to produce potash at lower costs than Noranda and PCA.

During the course of the antidumping investigation, the Saskatchewan Government was considering the enactment of legislation that would control the production of potash in that Province. Throughout July and August of 1987, Pat Smith ("Smith"), who was the Minister of Energy and Mines in Saskatchewan, met with representatives of the Canadian producers in order to discuss the implications of any such legislation. *Declaration of Pat Smith* at ¶ 6, attached as *Exhibit 5, Defendants' Joint Reply Memorandum in Support of Summary Judgment, Supplemental Affidavit of John D. French ("Defs.' Jt.Rep.Aff.").* On September 1, 1987, less than two weeks after the announcement of the dumping margins, the Saskatchewan Government introduced the Potash Resources Act. The Act, which was approved by the Saskatchewan Parliament on September 18, 1987, allowed for the creation of a Potash Management Board, which would be empowered to set quotas for each Saskatchewan mine, so as to control the quantity of potash that could be produced in the Province.[9] *Potash Resources Act,* attached as *Exhibit 37, Defs.' Jt.Memo.Aff.* Notations of a meeting, that was attended by representatives of the Provincial Government, and by Noranda, reveal that, while the Government viewed itself as a victim of the antidumping action, it was keenly aware that the price of potash was too low and that the supply was too high. *Noranda Memorandum dated July 31, 1987 (NOR 406039),* attached as *Exhibit 42, Defs.' Jt.Memo.Aff.*

In response to the preliminary dumping margins, on September 4, 1987, PCS announced a $35 price increase, effective immediately, which resulted in a total price of $93 for a short ton of granular grade potash. Assertedly, PCS arrived at the $35 figure because it reflected the industry's average antidumping margin. *Childers Deposition* at 80, attached as *Exhibit 45, Defs.' Jt. Memo.Aff.* According to PCS's Annual Report in 1987, the $35 increase "served the additional purpose of making the U.S. farm sector aware of potential price increases if the preliminary duties were upheld in a final Department of Commerce decision." *PCS 1987 Annual Report,* attached as *Exhibit 43, Defs.' Jt.Memo.Aff.* Thereafter, the remaining Defendant producers, as well as several offshore producers, who were not included in the antidumping proceeding, matched the $35 increase.

9. In years past, the potash industry had been the subject of an antidumping action, and of prorationing legislation. For example, because of production increases, potash prices fell approximately 50 percent in the latter half of the 1960's. In August of 1969, the United States determined that dumping had occurred and, contemporaneously, the Saskatchewan government enacted a prorationing scheme in order to increase the price of potash that was to be sold in the United States. Under this scheme, not only was each producer granted a production quota, but a minimum price was established which, if violated, would threaten a cancellation of the producer's production license. *See, e.g.,* Picketts, Schmitz & Schmitz, *Rent Seeking: The Potash Dispute Between Canada and the United States,* Amer. J.Ag.Econ. 255, 260 (May 1991), attached as *Exhibit 7, Defs.' Jt.Memo.Aff.* Nevertheless, this prorationing legislation was eventually overturned, in the Canadian Courts, for the setting of a floor price would, impermissibly, infringe upon trade. Haglund & von Bredow, *The Politics of Antidumping: The Potash "War" of 1986–1988,* in U.S. Trade Barriers and Canadian Minerals: Copper, Potash and Uranium (1990), at 78, attached as *Exhibit 5, Defs.' Jt.Memo.Aff.*

Following the announcement of the preliminary dumping margins, IMC, Kalium, and Noranda sought downward revisions in their dumping margins, while the United States petitioners, including NMP, requested an upward revision in some of the companies' margins. In addition, PCS commenced a lobbying effort, in order to enlist the support of American farmers, in its effort to persuade the DOC to rescind the margins. On January 8, 1988, just short of the deadline for its announcement of a final determination, the DOC negotiated a Suspension Agreement with each of the Canadian producers. Under the terms of this Agreement, a Canadian producer could sell at less than fair value by no more than 15 percent of its previously determined dumping margin.[10] *Suspension of Antidumping Duty Investigation: Potassium Chloride From Canada,* 53 Fed.Reg. 1393, 1394 (January 19, 1988), attached as *Exhibit 35, Defs.' Jt.Memo.Aff.*

As an additional term of the settlement, each producer had the right to withdraw from the Agreement, and the entire Agreement was to be terminated, and the investigation resumed, if producers, who accounted for 15 percent or more of Canadian potash exports to the United States, elected to opt out. *Title 19 C.F.R. § 353.18.* Although the DOC expected that, absent some "likelihood of injurious effect on exports of potassium chloride from Canada," the Agreement would expire in January of 1993, we are advised that the Agreement remains in effect today. *Suspension of Antidumping Duty Investigation: Potassium Chloride From Canada,* 53 Fed.Reg. 1393, 1395 (January 19, 1988), attached as *Exhibit 35, Defs.' Jt.Memo.Aff.; Defs' Jt.Memo.* at 8.

On the same date that the producers entered into the Suspension Agreement, PCS announced that, on January 11, 1988, it would distribute new price lists, which would reflect an $86 price for granular grade potash, which constituted an $18 increase. *Telexes dated January 8, 1988 (NOR 416856, MI 59809),* attached as *Exhibit 11, Defs.' Jt.Rep.Aff.* Within the following eleven days, the remaining Canadian producers matched the $86 price, with the exception of Kalium, which announced a price of $87. See, *Pltfs.' Jt.Memo.* at 10 n. 15. In conjunction with its announcement of a price increase, PCS followed through on its prior promise that it would refund the $35 surcharge if the duties were not, ultimately, imposed. *PCS 1987 Annual Report,* attached as *Exhibit 52, Defs.' Jt.Memo.Aff.* The remaining Canadian producers again followed PCS's lead, and refunded, at least in part, the $35 surcharge.

In their Third Amended Complaint, the Plaintiffs allege that the sharp increase in the price of potash, from April of 1987, through January of 1988, was the result of a price fixing conspiracy. The Defendants, in turn, maintain that the price increases were the inevitable product of the antidumping proceeding, the prorationing legislation, and the management change at PCS. In the Defendants' view, the interdependent nature of pricing, within the potash industry, induced the individual firms to price their product at approximately the same levels. *Id.* at 5.

In opposition to the Motions for Summary Judgment, the Plaintiffs identify a series of actions, by each of the various Defendants, that they claim were contrary to that particular Defendant's economic self-interest—unless an agreement to fix prices was at play. In support of the asserted price fixing conspiracy, the Plaintiffs have identified various communications, between certain of the Defendants, which the Plaintiffs characterize as both frequent and integral to the conspiracy, and they have highlighted certain

---

**10.** In pertinent part, the Suspension Agreement provided as follows:

Each signatory producer/exporter of potassium chloride from Canada, individually, agrees that the price it will charge for each entry of potassium chloride exported to the United States from Canada for consumption in the United States will be such that the any amount by which the estimated foreign market value exceeds the United States price will not exceed 15 percent of the weighted-average amount by which the estimated foreign market value exceeded the United States price for all less-than-fair-value entries by such signatory producer/exporter that were examined during the Department's investigation.

*Suspension of Antidumping Duty Investigation: Potassium Chloride From Canada,* 53 Fed.Reg. 1393, 1394 (January 19, 1988), attached as *Exhibit 35, Defs.' Jt.Memo.Aff.*

purportedly retaliatory actions, that were taken by the Defendants, against ostensible price "cheaters." In addition, the Plaintiffs have offered the report of their expert witness, Gordon Rausser ("Rausser"), which examines the potash industry, and concludes that the structure of that industry is conducive to the formation of a price fixing conspiracy. Rausser also conducted a review of the Record, that was amassed in the discovery effort, and observed that certain of the Defendants' actions were inconsistent with individually rational, and economically maximizing, behavior. Lastly, Rausser has designed a statistical model, with which he has analyzed the price of potash in the United States and, according to the results of that analysis, he has concluded that the prices that were existent, during the conspiracy, exceeded the prices that had been forecasted in the model, by an average of 35 percent.

Not surprisingly, the Defendants challenge the validity of Rausser's Report. They claim that not only are the conclusions reached by Rausser in error, but that the methods, which he employed to reach those conclusions, have failed to account for other relevant evidence. Further, the Defendants offer the reports of their own economic experts, each of whom supports their contention that the challenged price increases were the natural product, not of a conspiracy, but of a combination of events that were occurring in the potash marketplace.

The Plaintiffs have also alleged that, throughout the period of their assertedly unlawful conduct, the Defendants have attempted to cloak their conspiracy by engaging in acts of fraudulent concealment, including: (1) "secretly and conspiratorially" discussing and agreeing upon the prices to be charged to their customers; and (2) announcing price increases in a "staggered fashion." *Third Amended Complaint* at ¶ 57. In addition, the Plaintiffs contend that neither they, nor the members of the Class, had any knowledge that the Defendants were conspiring "[u]ntil shortly before the filing of the Complaint in this action," nor could they have "discovered any of the violations at any time prior to this date by the exercise of due diligence." *Id.* at ¶ 56. Based upon these asserted acts of fraudulent concealment, the Plaintiffs contend that the statute of limitations, which governs this action, should be equitably tolled. *Id.* at ¶ 59.

## III. *Discussion*

The core issue before us is whether the Plaintiffs have produced sufficient evidence, in support of the alleged conspiracy, to survive the Defendants' Motions for Summary Judgment. We conclude that they have not.

A. *The Defendants' Common Motions for Summary Judgment.*

1. *Standard of Review.* In antitrust cases, as in other civil actions, a Motion for Summary Judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rule 56(c), Federal Rules of Civil Procedure; Bathke v. Casey's General Stores,* 64 F.3d 340, 342 (8th Cir.1995) ("In complex antitrust cases, no different or heightened standard for the grant of summary judgment applies."); *In re Travel Agency Com'n Antitrust Litigation,* 898 F.Supp. 685, 690 (D.Minn.1995) (The principle underlying summary judgment "holds for antitrust claims, as it does for other civil theories."). For these purposes, a disputed fact is "material," if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine," if the evidence is such that a reasonable Jury could return a Verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").

As Rule 56(e) makes clear, once the moving party presents a properly supported Motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. In rebutting the showings of

the movant, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but * * * must set forth *specific facts* showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure* [emphasis supplied]; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, supra at 586, 106 S.Ct. at 1355–56 ("[O]pponent must do more than simply show there is some metaphysical doubt as to the material facts.").

Moreover, a party is entitled to Summary Judgment where its opponent has failed "to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such a case, no genuine issue of material fact will be found to exist because "a complete failure of proof concerning an essential element of [that party's] case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552. Of course, "[i]n determining whether a material factual dispute exists, the court views the evidence through the prism of the controlling legal standard." *Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). Accordingly, the prism, through which we here appraise the propriety of Summary Judgment, is the law of antitrust, as that law has evolved in the unique environs of an oligopolistic market.

In this respect, Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *Title 15 U.S.C. § 1.* The essence of a Section 1 claim is concerted action and, because the law re-

quires an agreement between two or more persons, "[u]nilateral actions of a single entity do not give rise to antitrust liability under section one of the Sherman Act." *Willman v. Heartland Hosp. East*, 34 F.3d 605, 610 (8th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995); *Fisher v. City of Berkeley, Cal.*, 475 U.S. 260, 266, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986) ("Even when a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of an agreement.").[11]

Thus, "[o]n a claim of concerted price fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). "The standard is whether the evidence, direct or circumstantial, 'reasonably tends to prove that the [alleged violator] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Pumps & Power Co. v. Southern States Industries*, 787 F.2d 1252, 1256 (8th Cir.1986), quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, supra at 764, 104 S.Ct. at 1470–71. More recently, the Supreme Court has elaborated upon this standard, and has determined that, in order to successfully oppose a Motion for Summary Judgment, the nonmoving party "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, supra at 588, 106 S.Ct. at 1356–57.

As the Plaintiffs have correctly observed, the precepts of antitrust law do not alter the principle that, "[o]n summary judgment[,]

---

**11.** Of course, not every agreement that restrains competition will violate the Sherman Act. It is well settled that Section 1 prohibits only those agreements which unreasonably restrain competition. In identifying such offending agreements, the Supreme Court has held that certain kinds of accords are unreasonable *per se*, such as agreements among competitors to fix prices. *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 224–26 n. 49, 60 S.Ct. 811, 844–46 n. 49, 84 L.Ed. 1129 (1940); *Capital Imaging v. Mohawk Valley Medical Assoc.*, 996 F.2d 537, 542–43 (2d Cir.1993) (listing the types of *per se* violations that have been recognized by the Supreme Court), cert. denied, 510 U.S. 947 (1993). Here, the Plaintiffs have alleged a horizontal price fixing conspiracy—that is, one that involves concerted action on only one level in a product's distribution chain—and, therefore, the only inquiry is whether the agreement existed, since the unreasonableness of such a restraint is presumed. Cf., *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 n. 4 (7th Cir. 1987).

the inferences to be drawn from the underlying facts * * * must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, supra at 587–88, 106 S.Ct. at 1356–57, quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Nevertheless, where, as here, there is no direct evidence of collusion,[12] "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, supra at 588, 106 S.Ct. at 1356–57. Specifically, "conduct as consistent with permissible conduct as with [an] illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* In such cases, the plaintiff must "present evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." *Id.*, quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, supra at 764, 104 S.Ct. at 1470–71.

As a consequence, the plausibility of the underlying economic motive limits the range of permissible conclusions that may be drawn from ambiguous evidence. Indeed, "the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e)." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, supra at 596, 106 S.Ct. at 1361. In such an instance, the Record on Summary Judgment must contain further persuasive evidence if it is to support the claim for recovery. While the conspiracy, that was alleged in *Matsushita*, may have been an implausible one, the Supreme Court rejected the view that ambiguous evidence creates a Jury issue merely because the alleged conspiracy is objectively reasonable. As the Court explained: "We do not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of con-

spiracy." *Id.* at 597 n. 21, 106 S.Ct. at 1361 n. 21.

As the Supreme Court has more recently observed, in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992), by requiring that the plaintiffs' claims make economic sense, *Matsushita* did not invent a new requirement in an antitrust context, but merely articulated an established standard—namely, "that the nonmoving party's inferences be reasonable in order to reach the jury." As a consequence, "[i]f the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.*

In applying these principles, our Court of Appeals, in *Lovett v. General Motors Corp.*, 998 F.2d 575 (8th Cir.1993), cert. denied, 510 U.S. 1113, 114 S.Ct. 1058, 127 L.Ed.2d 378 (1994), reversed a Jury's Verdict against a defendant car manufacturer, on the plaintiff's claim that the manufacturer had conspired with some of its auto dealers to injure the plaintiff's dealership. The plaintiff had been selling cars at a price which undercut other, neighboring dealerships. After several dealers complained, the defendant limited its sales allotments to the plaintiff. In granting the defendant Judgment as a matter of law, the Court explained that "the district court failed to recognize that [plaintiff's] evidence [was] as consistent with permissible unilateral conduct on [defendant's] part as it [was] with illegal conspiracy, and that *Monsanto* does not permit a jury to infer the existence of a conspiracy from ambiguous evidence." *Id.* at 579; see also, *Willman v. Heartland Hosp. East*, supra at 612 (affirming grant of Summary Judgment to a hospital, and to members of its medical staff, on a physician's claim that he was denied staff privileges, because the defendants' actions were "as consistent with the lawful purpose of promoting

---

**12.** The Plaintiffs have produced no direct evidence of a price fixing agreement. Otherwise stated, the Plaintiffs have not pointed to a single document, or excerpt of testimony, that, were we to accept the evidence as true, would establish the alleged conspiracy. Indeed, at the Hearing on the Motions, Plaintiffs' counsel conceded that there is "no direct evidence of an agreement *per se*." *Transcript of Summary Judgment Hearing* at

137. Rather, the Plaintiffs exclusively rely upon circumstantial evidence in their proof of the alleged conspiracy. Accordingly, our task is to determine whether that circumstantial evidence, and any justifiable inferences that may be drawn therefrom, are sufficient to create genuine issues of material fact that would warrant the submission of their case to a Jury.

quality patient care as with the unlawful purpose of eliminating potential competitors.").

Of course, participation in a price fixing conspiracy need not be, nor rarely is, shown by direct evidence, for most conspiracies are proved through inferences that are drawn from the behavior of the alleged conspirators. *ES Development, Inc. v. RWM Enterprises, Inc.*, 939 F.2d 547, 553 (8th Cir.1991) (citations omitted) ("[I]t is axiomatic that the typical conspiracy is rarely evidenced by explicit agreements, but must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators."), cert. denied, 502 U.S. 1097, 112 S.Ct. 1176, 117 L.Ed.2d 421 (1992). As a consequence, the Court should not compartmentalize the evidence that is proffered by an antitrust plaintiff but, rather, should analyze the plaintiff's showings as a whole so as to determine if, in its integrated entirety, the evidence supports an inference of concerted action. See, e.g., *In re Workers' Compensation Ins. Antitrust Lit.*, 867 F.2d 1552, 1563 (8th Cir.1989) ("piece-meal analysis must be avoided and the overall conduct of the defendants must be weighed."), cert. denied, 492 U.S. 920, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989).

Nevertheless, as our Court of Appeals has observed, "a fine line separates unlawful concerted action from legitimate business practices." *Lovett v. General Motors Corp.*, supra at 578. Accordingly, "care must be taken to ensure that inferences of unlawful activity drawn from ambiguous evidence do not infringe upon the defendants' freedom." *Petruzzi's IGA v. Darling–Delaware*, 998 F.2d 1224, 1230 (3rd Cir.1993), cert. denied, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993), quoting *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358 (3rd Cir.1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). Indeed, in *Monsanto*, the Supreme Court expressed concern that independent action may, quite improperly, be viewed as evidence of a conspiracy. *Monsanto Co. v. Spray–Rite Serv. Corp.*, supra. There, the plaintiff alleged that Monsanto had illegally conspired, with its other distributors, to ter-

minate the plaintiff's distributorships. The Court observed that "[t]o permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would * * * inhibit management's exercise of its independent business judgment." *Id.* at 764, 104 S.Ct. at 1470–71.

Given the clear import of the foregoing authorities, even in the milieu of antitrust law, Summary Judgment is neither an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury to weigh the evidence and to render credibility determinations. *Celotex Corp. v. Catrett*, supra at 327, 106 S.Ct. at 2554–58; *Health Care Equalization Com. v. Iowa Medical Soc.*, 851 F.2d 1020, 1031 (8th Cir.1988) (citing *Celotex* in antitrust case). We are mindful, however, that only concerted action is within the proscriptions of the Sherman Act and, therefore, we have the added responsibility of assuring that any underlying, lawful conduct is not, inadvertently, condemned and penalized. See also, *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1322 (4th Cir.1995) ("[B]ecause of the unusual entanglement of legal and factual issues frequently presented in antitrust cases, the task of sorting them out may be particularly well-suited for Rule 56 utilization."); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 660 n. 4 (7th Cir.1987) (citation omitted) ("The ultimate determination, after trial, that an antitrust claim is unfounded may come too late to guard against the evils that occur along the way."), cert. denied, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); *Lovett v. General Motors Corp.*, supra at 581 ("[T]he jury's finding of a conspiracy in this case shows why cases based on ambiguous evidence should not be submitted to a jury.").

As *Matsushita* confirms, whether the underlying, circumstantial evidence is sufficient to support a reasonable inference of collusion remains a legal question for the Court's resolution. Thus, evidence which permits equally competing inferences, without "tending" to point in one direction, should not be sent to

the Jury, for the Court may not invite the factfinder to speculate on the consummation of an agreement to restrain trade. Of course, if the underlying conduct is sufficient to support such an inference, then "the question of what weight should be assigned to competing permissible inferences is within the province of the fact-finder at trial." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2nd Cir.1987), cert. denied, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).

One means by which the Courts may ensure that unilateral, nonconspiratorial conduct is not unintentionally punished is to require the plaintiffs to demonstrate something more than mere paralleling or mimicking conduct. See, e.g., *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259–60, 98 L.Ed. 273 (1954). Of course, if persons acted in near unison, but independently of one another and without any agreement or mutual understanding amongst them, then there is no conspiratorial showing. In effect, "individual pricing decisions (even when each firm rests its own decision upon its belief that competitors will do the same) do not constitute an unlawful agreement under section 1 of the Sherman Act." *Clamp–All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 484 (1st Cir.1988), cert. denied, 488 U.S. 1007 (1989), see also, *Petruzzi's IGA v. Darling–Delaware*, supra at 1232; *Reserve Supply v. Owens–Corning Fiberglas*, 971 F.2d 37, 51 (7th Cir.1992); *Apex Oil Co. v. DiMauro*, supra at 253; *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 904 (9th Cir.1987).

■ History teaches, however, that in an oligopolistic market, interdependent decision making may produce cartel-like results, *In re Coordinated Pretrial Proceedings*, 906 F.2d 432, 444 (9th Cir.1990), cert. denied, 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991), for, in an oligopoly, each firm understands that its own pricing decisions will affect the others in that market, who are likely to respond, and whose response will affect the profitability of the pricing decision. As Professor Areeda explains:

> When one oligopolist raises its price, each of his rivals must decide whether to follow or not. Continuing the previous price

would allow each of the others to increase his sales if the leader persists in charging a higher price. But each knows that the leader is likely to retract an increase that is not followed. Accordingly, each rival asks himself whether he is better off at the lower price when charged by all or at the higher price when charged by all. If the latter, as will often be the case, the leader's price increase is likely to be followed.

*VI Areeda,* § 1410b at 65.

Notwithstanding this potential consequence, the existence of mere parallel pricing, in an oligopoly, is not, standing alone, actionable. See, e.g., *Reserve Supply v. Owens–Corning Fiberglas*, supra at 50 (quoting *E.I. du Pont De Nemours & Co. v. FTC*, 729 F.2d 128, 139 (2d Cir.1984) ("It is well-established, however, that '[t]he mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws.") As the First Circuit has observed, in *Clamp–All Corp. v. Cast Iron Soil Pipe Institute*, supra at 484, allowing oligopolists to mimic each others prices "is not because such pricing is desirable (it is not), but because it is close to impossible to devise a judicially enforceable remedy for interdependent pricing[;] [h]ow does one order a firm to set its prices *without regard* to the likely reactions of its competitors?" [Emphasis in original]. See also, *United States v. International Harvester Co.*, 274 U.S. 693, 708–09, 47 S.Ct. 748, 753–54, 71 L.Ed. 1302 (1927) ("[T]he fact that competitors may see it proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination.").

■ Therefore, in order to present a Jury question as to the existence of a conspiracy, there must be a parallelism in pricing that is accompanied by competent, additional evidence. But see, *Coleman v. Cannon Oil Co.*, 849 F.Supp. 1458, 1466 (M.D.Ala.1993) (There must therefore be parallelism accompanied by *substantial additional evidence* to support a finding of an agreement necessary to establish a violation of § 1 of the Sherman Act.) [emphasis in original], citing *Theatre*

*Enterprises, Inc. v. Paramount Film Distributing Corp.,* supra at 541, 74 S.Ct. at 259–60. Accordingly, it is now settled antitrust law that only when the plaintiff shows the existence of this additional evidence—often referred to as the "plus factors"—does the evidence tend to exclude the possibility that the defendants were actually acting independently. *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1456 n. 30 (11th Cir.1991) ("[A]n agreement is properly inferred from conscious parallelism only when 'plus factors' exist."); *Apex Oil Co. v. DiMauro,* supra at 253; *Petruzzi's IGA v. Darling–Delaware,* supra at 1244 ("courts require plus factors because otherwise the evidence is equally consistent with legal behavior"); *In re Coordinated Pretrial Proceedings,* supra at 445.[13]

■ By way of example, consciously paralleling conduct may allow for an inference of an agreement if it is also shown that each conspirator acted against its own self-interest, by engaging in the paralleling behavior. See, e.g., *Petruzzi's IGA v. Darling–Delaware,* supra at 1242; *Reserve Supply v. Owens–Corning Fiberglas,* supra at 51; *Apex Oil Co. v. DiMauro,* supra at 253. Likewise, a high-level of interfirm communications, when viewed in conjunction with paralleling acts, can serve to allow a Jury to reasonably infer a conspiracy. See, e.g., *Market Force Inc. v. Wauwatosa Realty Co.,* 906 F.2d 1167, 1172 (7th Cir.1990); *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.,* 913 F.Supp.

1088, 1117 (N.D.Ill.1995), vacated on other grounds, pursuant to settlement (September 18, 1995).

■ Nevertheless, where an examination of the proffered "plus factors" leads to an equally plausible inference that merely interdependent behavior is at hand, then there is no triable issue that would preclude a grant of Summary Judgment, so long as there is no evidence which tends to exclude the possibility that the alleged conspirators acted independently. See, *Market Force Inc. v. Wauwatosa Realty Co.,* supra at 1171; *Apex Oil Co. v. DiMauro,* supra at 254. This is so, because "[a]mbiguous evidence cannot be sent a jury [as] a court may not invite the factfinder to speculate that an agreement existed." *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.,* supra at 1104. In the final analysis, a "[f]ailure on the part of the plaintiff to produce evidence from which a jury could infer reasonably that conduct was conspiratorial, not unilateral, will lead to summary judgment for the defendant." *Richards v. Neilsen Freight Lines,* supra at 902.

*2. Legal Analysis.*

*a. Overview.* We begin with an explanation of the analytical approach that we have employed; not because it is novel—for it is not—but because of the potential for misapprehension.[14]

---

**13.** Although not expressly denominated as "plus factors," our Court of Appeals has required antitrust plaintiffs to proffer evidence, that is additive to conscious parallelism, in order to avert an award of Summary Judgment. In *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 883 (8th Cir.1978), the Court looked to whether the parallel conduct was "inconsistent with the self-interest of the individual actors." Indeed, in a related context, the Court concluded that a manufacturer's simple refusal to sell to dealers, who would not sell at suggested retail prices, was insufficient to support a finding that there was an illegal combination to fix retail prices. *Russell Stover Candies, Inc. v. Federal Trade Commission,* 718 F.2d 256, 260 (8th Cir.1983). Notably, the Court found that there were "no 'plus factors' to take the case beyond *Colgate,*" a Supreme Court decision that had permitted such conduct. *Id.* at 260, citing *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Accordingly, we believe that, if confronted with this issue, our Court of Appeals would adopt the

reasoning of those Courts, which have analyzed the sufficiency of an antitrust plaintiff's evidence, that is proffered in opposition to a Motion for Summary Judgment, on "plus factor" grounds.

**14.** We think that the parameters of the applicable analytical regime were well-stated in *Reserve Supply v. Owens–Corning Fiberglas,* 971 F.2d 37, 49 (7th Cir.1992):

In [ruling on Motions for Summary Judgment on price fixing claims], the court should first examine the plaintiff's evidence of a conspiracy among the defendants. Next it should examine whether the defendants have offered evidence tending to show that the conduct complained of is as compatible with the defendants' legitimate business activities as with illegal conspiracy. If the court concludes that the foregoing analysis leaves the evidence of conspiracy ambiguous, it should then determine whether the plaintiff can point to any evidence that tends to exclude the possibility

**1352**

What follows is an exhaustive and, perhaps, an uncompromisingly tedious,[15] appraisal of the evidentiary showings that the Plaintiffs regard as demonstrating the existence of triable issues of price fixing. In conducting this review, we recognize that, by superficial appearance, concern could be expressed that we have invaded the proper role of the Jurors in, at least ostensibly, assessing the believability of the Plaintiffs' evidence. We have not. Rather, we have assumed our customary role as a gatekeeper of the evidence; assuring that only competent evidence is submitted for the Jury's consideration. In this sense, the function we fulfill is indistinguishable from our conventional assessment of the qualitative worth of proffered evidence.

We accept, without reservation, our incapacity to adjudge, under the rubric of Rule 56, the credibility of the evidence, but we no more render believability judgments in weighing the reliability of an evidentiary submission, than we do, say, in rejecting expert opinion evidence as being unworthy of a Jury's reliance, in excluding testimony as impermissible hearsay, or in barring the admission of matter that was not subject to the witness's personal knowledge. While a

Court's ruling on such matters could be framed as a believability assessment, at its core, the ruling is, quintessentially, one of "screening," so as to "ensure" that the "evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469 (1993); and see, *Rule 802, Federal Rules of Evidence;*[16] *Rule 602, Federal Rules of Evidence,*[17] and related *Advisory Committee Notes, Rules 602 and 802, Federal Rules of Evidence.*

Here, the parties agree—as, indeed, they were obliged to do by the weight of the governing law—that the examination of a price fixing claim, in the unique environs of an oligopolistic market, requires more of a showing than the mere existence of the spontaneous forces which cause oligopolists to parrot the pricing decisions of a market leader. In the parlance, the price fixing claimant must present "plus factors"—that is, reliable indicators of unlawful price fixing—if a *genuine* issue of material fact is to be presented for a Jury's resolution. After a most painstaking review, we find that the Plaintiffs have failed to offer such a positive showing, since what they have submitted for our review is, quite literally, "nonplus"—that is,

---

that the defendants were pursuing their legitimate independent interests.

See also, *Petruzzi's IGA v. Darling–Delaware*, 998 F.2d 1224, 1231–33 (3rd Cir.1993), cert. denied, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993); *Dunnivant v. Bi–State Auto Parts*, 851 F.2d 1575, 1583 (11th Cir.1988); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252–54 (2nd Cir.1987), cert. denied, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); but see, *In re Coordinated Pretrial Proceedings*, 906 F.2d 432, 440 (9th Cir. 1990), cert. denied, 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991).

**15.** We have conscientiously attempted to address each of the items of evidence that the parties have drawn to our attention, but we recognize that one scintilla or another will, almost certainly, escape specific comment. We merely note here that we have conducted both a microscopic and a macroscopic review of the evidence and, if a particular document, or depositional reference, has not been specifically discussed, that does not suggest that the evidence has not been closely considered in our view of the evidence as a whole. See, e.g., *Big Apple BMW, Inc. v. BMW of North America*, 974 F.2d 1358, 1364 (3rd Cir.1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

**16.** The Advisory Committee's Notes, on Article VIII of the Federal Rules of Evidence, expressly recognizes the tension between excluding all hearsay evidence, and admitting that which, for one reason or another, is regarded as sufficiently reliable. In the Committee's words:

The solution evolved by the common law has been a general rule excluding hearsay but subject to numerous exceptions under circumstances supposed to furnish guarantees of trustworthiness.

See, also, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 n. 9, 113 S.Ct. 2786, 2795 n. 9, 125 L.Ed.2d 469 (1993).

**17.** As explained by the Advisory Committee Notes to Rule 602, Federal Rules of Evidence:

" * * * [T]he rule requiring that a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact" is a "most persuasive manifestation" of the common law insistence upon "the most reliable sources of information."

Quoting, *McCormick* § 10, p. 19; see also, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, supra at 590 n. 9, 113 S.Ct. at 2795 n. 9.

evidence which places us, because of its substantive ambivalence, in a quandary as to what the evidence should, with any reliability, mean.

In expressing these views, we intend no discredit to the Plaintiffs' effort to raise a genuine issue of material fact. We are advised, and we have no reason to believe otherwise, that hundreds of thousands of discovery documents have been culled by the Plaintiffs, with the result that a grouping of perhaps a hundred, or more, have been isolated, at least in the Plaintiffs' view, as favoring an inference of collusion. Given the sheer volume of this submission, as expanded by the Plaintiffs' recitation of pertinent depositional testimony, there is an instinctive, natural inclination to presume that such a daunting collection of documents must, *a fortiori*, generate triable issues of fact. Our review, however, has convincingly persuaded us otherwise.

By way of a brief analogy, quite recently, in *Wright v. Willamette Industries, Inc.*, 91 F.3d 1105 (8th Cir.1996), our Court of Appeals was obliged to determine whether the plaintiffs had presented a submissible case to a Jury concerning the ill-health effects that they attributed to living next to an operation that exposed them to formaldehyde. Although a Jury awarded damages to the plaintiffs, and notwithstanding the Trial Court's denial of the defendants' post-Trial Motions, the Court of Appeals reversed, because the claimants had failed to establish the level of exposure to formaldehyde that was reasonably known to cause adverse health consequences. In the absence of such a causative showing, the Court concluded that the Jury could do no more than speculate on the issue of causation. *Id.* at 1108. While we grant that the issues we confront here do not have the objectivity of medical science, we are aware of no reason why they should escape the "reasonable inference" standard that the Court employed in *Wright.*

Where the empirically established principles, which govern the operation of an oligopolistic market, and which reliably confirm that, left to spontaneity, the market will be driven by a price leader, who the other participants in the market will follow, we believe that something more than a suspicion of culpability should properly stave an award of Summary Judgment. While, obviously, we view the evidence presented in a light most favorable to the nonmovant—here the Plaintiffs—the governing law makes clear, "[s]uch inferences * * * must be 'justifiable.'" . *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, supra at 659. Accordingly, we need not view each of the evidentiary submissions as inferring complicitous wrongdoing, merely because a cramped, or inventive interpretation of that evidence, as driven by some assumption of unlawfulness, would arguably allow that result. To do so, would improperly subject the oligopolist to the artificiality of a jejune existence, merely because conduct, which is a normal and innocent expression of natural, economic forces, can be "spun" into a suggestion of complicity. Our review of the caselaw, which we have heretofore detailed, makes clear that the Courts have remained vigilant to assure that a blameless emulation of pricing policies, by participants in an oligopoly, does not incur unwarranted reprobation. This would seem all the more obvious where, as here, the oligopoly has been impacted by both pure economic forces, and by the unavoidable skew that is bred through the well-intentioned, but invidiously intrusive, protectionist interests of one or more governments. Given this entanglement of fact, law and economics, the governing standard of review, and the dearth of evidence which tends to exclude the possibility that the complained of conduct was not the outcome of independent corporate will, we do not say that no price fixing conspiracy could possibly have existed, we merely conclude that the Plaintiffs have presented an insufficient showing to allow the issue to be submitted to a Jury.

With this perspective as our backdrop, we examine the Plaintiffs' evidentiary showings, as they have grouped them, in three categories of generalized proof, in order to examine whether a genuine issue of material fact has been demonstrated for a Jury's disposition. These categories—namely, opportunity and motive; behavior that is contrary to economic self-interest; and interfirm communications—represent the "plus factors," that the

Plaintiffs have relied upon, in conjunction with the evidence of price parallelism, in their effort to elude an award of Summary Judgment. *Pltfs.' Jt.Opp.Memo.* at 35–39. While we will follow the Plaintiffs' lead in compartmentalizing our discussion of this evidence, we have carefully reviewed this evidence as an blended whole, together with the Defendants' explanations for their conduct, so as to ascertain whether an "inference of conspiracy is reasonable in light of the competing inference of independent action." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* supra at 588, 106 S.Ct. at 1356–57.[18] Since we conclude, following a considered review of the Record before us, that an inference of a conspiracy, which could justifiably arise from this Record, would consist of unreasoned speculation, we recommend that the Defendants' Motions be granted.

b. *Opportunity and Motive.* As to their first "plus factor," the Plaintiffs have asserted that, "from meetings of Canpotex[19] to the plethora of trade association meetings and telephone calls, the executives of defendants were in constant communication"—ergo, the Defendants had an opportunity to conspire. *Pltfs.' Jt.Opp.Memo.* at 36. Nevertheless, while proof of an occasion to conspire may, as a practical matter, satisfy a necessary precondition of a conspiracy, "[a] jury cannot reasonably infer the existence of a conspiracy merely from the opportunity to form one." *Utesch v. Dittmer,* 947 F.2d 321, 331 (8th Cir.1991), cert. denied, 503 U.S. 1006, 112 S.Ct. 1764, 118 L.Ed.2d 425 (1992), quoting *H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531, 1545 (8th Cir.1989); see also, *Coleman v. Cannon Oil Co.,* 849 F.Supp. 1458, 1469 (M.D.Ala.1993) (quoting *VI Areeda,* § 1417b at 97) (Evidence that the defendants "met together or telephoned each other * * * 'satisfies the necessary precondition of any traditional conspiracy that the parties have the opportunity to conspire', but 'it remains the plaintiff's burden to prove that the

defendant succumbed to the temptation and conspired.' ").

■ As a result, the Plaintiffs' evidence of informal communications among the alleged conspirators, standing alone, merely provides an opening for collusion, rather than unambiguous evidence from which a reasonable inference of concerted action can properly be drawn. See, *Market Force Inc. v. Wauwatosa Realty,* supra at 1172; *Petruzzi's IGA v. Darling–Delaware,* supra at 1242 n. 15. To infer a conspiracy premised upon the Defendants' association in Canpotex, upon their attendance at trade association meetings, or upon their telephone communications, without any showing that the those associations or communications were dedicated to concerted action, would be tantamount to condemning wholly lawful conduct, merely because the conduct could be abused by a malefactor. Since "opportunity" evidence can vary in its degree of persuasiveness, at this point, we defer our examination of the substance of these communications, and of the reasonable inferences that may be legitimately drawn therefrom. Instead, at this juncture, we merely acknowledge the obvious, that routine and justifiable contacts amongst competitors, such as the conduct of meetings and the participation in the affairs of business associations is, at best, evidence of a most ambiguous sort.

With respect to motive, there can be little dispute over the Defendants' recognition that each would benefit from a uniform increase in the price of potash. Indeed, as Professor Areeda has explained, "because competitors can profit from conspiring to fix prices, they are deemed to have the motive to do so." II P. Areeda & H. Hovenkamp, *Antitrust Law* § 322g at 80 (1995) (hereafter "II Areeda"). Here, as a showing of motive, the Plaintiffs note that, on September 25, 1986, the then-president of PCS Sales, Rolf Holzkaemper ("Holzkaemper"), stated: "It is not possible

---

**18.** We note that, as one might expect, the Plaintiffs' "plus factors" roughly track the development of the alleged conspiracy. For example, the evidence of "motive and opportunity" generally corresponds to those months preceding April of 1987, whereas the evidence of "self-interest" and of "interfirm communication," approximates

the period in which the Defendants are alleged to have conspired in fixing prices.

**19.** Canpotex was a lawful cartel, created pursuant to Canadian law, which set prices for potash that would be sold outside of the United States. *Pltfs.' Jt.Opp.Memo.* at 36 n. 41.

for a single producer to affect a turn-around; however, joint action by a group of producers or governments could achieve this." *Holzkaemper Memorandum (PC 361765),* attached as *Tab 2, Pltfs.' Jt.Opp.Aff.* In addition, the Plaintiffs have identified an undated document from PCS stating:

> Cannot wait for supply/demand to pull us up. Cannot do it alone. Industry must cooperate. Key is discipline.

*Undated PCS Document (PC 297675),* attached as *Tab 2, Pltfs.' Jt.Opp.Aff.*

Further, the Plaintiffs have pointed to some isolated notations, from a meeting, on May 12, 1986, between certain representatives of PCS and Peat Marwick & Mitchell ("Peat Marwick"), which is an international consulting firm that had been retained by PCS.

On the basis of these notations, the Plaintiffs suggest that, during the conference of May 12, 1986, Peat Marwick proposed collusion as a strategy for returning PCS to profitability, by explaining that, "in order to increase prices there must be a reduction in supply," and by proposing "three possible solutions":

> a) Keep prices low in the short-term to force out marginal producers.
>
> b) That the industry arrange voluntary cutbacks or coordinated price increases.
>
> c) That the Government of Saskatchewan impose some form of rationing such as a special tax on producers in excess of, say 75% of their capacity.

*Peat Marwick Meeting Notes (PC 337391–94),* attached as *Tab 2, Pltfs.' Jt.Opp.Aff.* At best, this evidence suggests that PCS, as well as its retained consultant, recognized the need to raise prices, and to cut the supply of available product, in the interdependent potash market. Moreover, as the Defendants point out, on June 10, 1996, Peat Marwick clarified that it presented its scenarios "as the outcomes of potential policies that [might] be adopted by individual producers and/or government," and that, "[u]nder no circumstances did [it] suggest that PCS should try to 'arrange' an industry-wide capacity reduction or price increase in collusion with competitors." *Peat Marwick Letter (PC 334476),* attached as *Exhibit 16, Defs.'*

*Jt.Rep.Aff.* Each of the notations, that the Plaintiffs have highlighted can just as readily be construed as a recognition of the need for discipline, in an interdependent market, and we see no tendency for these notations to exclude the possibility of independent business action, here on PCS's part.

■ As was true with the evidence of "opportunity," while the absence of "motive" may negate an inference of conspiracy, its presence is not sufficient to infer that a conspiracy has occurred. See, *Reserve Supply v. Owens–Corning Fiberglas,* supra at 51. "If [motive] were sufficient to show conspiracy, then parallel pricing, especially in oligopoly, would be automatically conspiratorial, but it is not." *Id.*

As well, the Plaintiffs have also focused upon discussions, between the Saskatchewan Government and two of the Defendants, which related to the antidumping investigation. Purportedly, by alluding to certain proposed agreements, this evidence is supposed to support a reasonable inference that the Defendants ultimately reached an agreement to fix prices. We disagree.

On September 29, 1986, Andrew Elliott ("Elliott"), of PCS, met with officials from the Saskatchewan Government to discuss the antidumping investigation. An interoffice Memorandum of October 7, 1986, which memorializes the discussion, states as follows:

> Gosselin [a Canadian Embassy official] raised the question of whether some form of an agreement might be reached between the Ad Hoc Group [American potash producers who initiated the investigation] and Saskatchewan potash producers. I responded that this might move us from the prospect of an anti-dumping investigation to an anti-trust investigation and asked what possible kind of agreement he had in mind. He mentioned assurance of "no more firesales" (the interpretation of our IRS sale last winter) and Canadians' staying out of natural markets for New Mexico (presumably a reference to Kalium's "incursion" into Texas). * * * I gave Gosselin no understanding that we had an interest in pursuing such an agreement.

*Elliott Memorandum (PC 388233–36),* attached as *Tab 2, Pltfs.' Jt.Opp.Aff.*

Despite the Plaintiffs' characterization of this discussion as "bordering on the illegal," *Pltfs.' Jt.Opp.Memo.* at 7, we fail to see how a proposal, from a governmental official, to settle a potential trade dispute between two countries, is indicative of a conspiracy, especially when that proposal is expressly rejected.

We are similarly unimpressed with the Plaintiffs' reliance upon a Memorandum of October 26, 1986, which was authored by William Deeks ("Deeks"), who was the President of Noranda, which was directed to John Gordon ("Gordon"), who was Noranda's Vice–President, and which records that Noranda learned of the anti-dumping investigation on October 21. The Memorandum reports the substance of Deeks' conversation with Hank Armstrong, who was an official with the Canadian Embassy, in Washington D.C. Deeks recounts the discussion, which included an initiative of the Canadian Government, as follows:

> An overall objective would be to see whether or not it would be possible from the Canadian end to put together a proposal to the United States, which on the one hand could avoid a trade action, on the second hand would introduce some supply management to the situation, and overall would result in higher prices and would avoid a highly political trade action.

*Deeks Memorandum (NOR 955009),* attached as *Tab 6, Pltfs.' Jt. Opp.Aff.*

As with the Elliott Memorandum, however, we do not view this evidence as supporting a suggestion that any of the Canadian producers colluded with any potash producers, American or Canadian. Indeed, contrary to the Plaintiff's suggestion, the Record is uncontroverted that no other producers attended this particular meeting. *Deeks Deposition* at 203, attached as *Exhibit 18, Defs.' Jt.Rep.Aff.*

Lastly, the Plaintiffs identify an alleged statement by Cliff Kelly ("Kelly"), who was then the President of Kalium, to the effect: "You know, why can't we just kind of draw a line across the country and let the Canadians keep north of it and Americans stay south of it and resolve the whole thing that way." *Elliott Deposition* at 27, attached as *Tab 23, Pltfs'. Jt.Opp.Aff.* Purportedly, Kelly made this remark at a "Federal/Provincial/Industry Meeting," on February 19, 1987. A telex from an official with the Canadian Government, which was addressed to other government officials and to the representatives of the various Canadian producers, including the Canadian Defendants, states that the purpose of the meeting was "to coordinate the defence against this antidumping action." *February 13 Telex (AK 026421),* attached as *Tab 3, Pltfs.' Jt.Opp.Aff.*

Apparently, the Plaintiffs invite us to infer that Kelly proposed an agreement that would divide the North American potash market. Nevertheless, consistent with Elliott's interpretation, as it was related at the time of his deposition, the statement can be as logically read as expressing sarcasm, voiced out of frustration over the commencement of the antidumping proceeding. The inference, that Kelly intended to propose an agreement to conspire, is further undermined by the fact that Elliott has no recollection of a response to Kelly's remark, and by the reality that the antidumping proceeding was not settled on terms that were even remotely similar to those suggested by Kelly. *Elliott Deposition* at 27, attached as *Tab 23, Pltfs.' Jt.Opp.Aff.*

■ c. *Acts Against Self–Interest.* Next, the Plaintiffs urge that there is substantial evidence which reveals that the Defendants acted, on separate occasions, contrary to their own economic self-interest. As we have observed, the fact that a firm's action is against its self-interest might well be suggestive of the existence of a conspiracy. See, *Admiral Theatre Corp. v. Douglas Theatre Corp.,* 585 F.2d 877, 884 (8th Cir.1978) ("Only where the pattern of action undertaken is inconsistent with the self-interest of the individual actors, were they acting alone, may an agreement be inferred solely from such parallel action."). However, to support a reasonable inference of conspiracy, the conduct must reveal more than the mere recognition that an act is unwise—unless it is followed by its rivals—for it must competently disclose "individual action [that] would be so perilous

in the absence of advance agreement that no reasonable firm would make the challenged move without such agreement." *Coleman v. Cannon Oil Co.*, supra at 1467 (quoting VI *Areeda*, § 1434c at 215).

Accordingly, our analysis of the Plaintiff's second "plus factor"—the acts against self-interest—includes evidence of conduct that, despite its economic rationality, the Plaintiffs claim could not have occurred in the absence of a prior collusive agreement. As Professor Areeda has explained, "if the actual defendants could not or would not have acted as they did without advance communication and understanding, then their action necessarily proves a traditional conspiracy." *VI Areeda*, § 1425a at 144 (quoted in *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.*, supra at 1119).

Whether the asserted parallel action reflects a reasonable response to a business exigency, or a collusive restraint of trade, requires a close analysis of several events which approximated the alleged inception of the conspiracy; namely, PCS's unilateral decision to raise the price of potash by $35 in September of 1987; the remaining Defendants' response to that price increase; the Defendants' entry into the Suspension Agreement; the Defendants' conduct in rebating the surcharge, and in imposing an $18 increase in the price of potash; PCS's decision to supply PCA's need for potash after PCA's mine was flooded; and, the alleged transformation of the potash industry in 1987. In evaluating this evidence, which is largely comprised of the reactions of certain Defendants to exceptional, and nonrecurrent, events in the potash marketplace, we are mindful of the policy concerns which discourage any substitution of our supposed business acumen for that of the Defendants in the legitimate management of their corporate interests.

i. *The PCS September Price Increase.* The Plaintiffs claim that PCS's decision to increase its price for potash by $35, within days after the DOC's announcement of the preliminary antidumping margins, is highly probative of a conspiracy. *Pltfs.' Jt. Opp.Memo.* at 9. To support this contention, the Plaintiffs rely on several arguments,

none of which we find sufficient to raise a genuine issue of material fact.

At the outset, we consider Rausser's testimony that "Canadian potash producers may have been expected to increase price in order to cover the bond requirements imposed by these margins." *Supplemental Rausser Rept.* at ¶ 129, attached as *Tab 60, Pltfs.' Jt.Opp.Aff.* Rausser, however, believes that "the level of the price increase was generally greater than that required by the preliminary margins." *Id.* Apparently, the Plaintiffs are suggesting, albeit without supporting authority, that the size of the price increase, in and of itself, supports the inference of a conspiracy. However, as one Court has noted, "were we to permit [a conspiracy claim premised on the theory that price hikes were too high], few pricing decisions would be immune from antitrust scrutiny." *In re Coordinated Pretrial Proceedings,* supra at 445 (observing that the Federal Courts are unsuited to act as rate-setting commissions). Perhaps more importantly, however, we conclude—for reasons we later detail—that the Defendants' explanations, for the $35 increase in their price for potash, are not only plausible, but they are logically consistent with an independent exercise of business judgment.

Next, the Plaintiffs point to Childers' testimony that, rather than to select an increase which would correspond to PCS's preliminary dumping margin, the $35 increase, which reflected the industry average margin, was lower than that required by the margins. Childers, however, testified that he chose the industry-wide average not only to recover the potential duty, but also to demonstrate the impact of the duty on its potash customers in the United States. *Childers Deposition* at 87–88, attached as *Tab 17, Pltfs.' Jt.Opp.Aff.* According to Childers, and as supported by the Record before us, PCS hoped that its customers, once they became aware that the duty would cause potash prices to rise, would exert pressure, on the United States Government, to terminate the antidumping proceeding. *Id.; PCS Letter and Memorandum Addressing Lobbying Efforts (PC 33045 and PC 15542)*, attached as *Tab 47, Defs.' Jt. Memo.Aff.* In this same respect, Childers

testified that, "[i]n order for [the program enlisting support from United States farmers] to be successful we felt like there would have to be others besides us charging this surcharge and we felt like if that was going to happen it was more likely to happen if we used an industry average as opposed to a PCS average." *Childers Deposition* at 87–88, attached as *Tab 17, Pltfs.' Jt.Opp.Aff.* We find Childers explanation to be plausible and apt in rebutting any conjectural inference that PCS had acted collusively.

Nor do we find that Childers' testimony, that PCS acted without a contingency plan, in the event that the surcharge was not followed, as cogently suggesting the presence of an agreement to collusively restrain trade. *Childers Deposition* at 91–91, attached as *Tab 17, Pltfs.' Jt.Opp.Aff.* In this respect, the Plaintiffs appear to ask that we infer, from this excerpt of Childers' testimony, that an agreement existed among the producers which obviated the need for an optional, contingency plan. Given the evidence in this Record, which corroborates the economic reality that unilateral price increases are quickly reversible, we conclude that Childers' failure to recall an "optional plan" is unavoidably, and indecipherably, ambiguous. Moreover, on August 25, 1987, Doyle authored a Memorandum, which was directed to the account managers at PCS, and which fully supports a competing inference; namely, that PCS did not know how its rivals would respond to the dumping duty. *Doyle Memorandum (PC 50352)*, attached as *Exhibit 7, Defs.' Jt.Rep.Aff.* ("We are not sure that all our competitors intend to pass on this duty to their customers. Logic would dictate that they do so, but logic does not always prevail."). We find no unambiguous showing of collusion here.

Next, the Plaintiffs cite a Memorandum of May 7, 1987, from Childers to Gary Lane, who was also employed at PCS. In this Memorandum, Childers expressed concern that, due to the size of PCS, the antidumping investigation would place PCS at a much higher risk than its rivals. *Childers Memorandum* (PC 072520–26, attached as *Tab 2, Pltfs.' Jt.Opp.Aff.* Childers continued:

Even more disconcerting is the probability that the other Canadian producers will be slapped with a lower duty than PCS. Some of our Saskatchewan co-producers wouldn't mind a duty as long as PCS is hit harder than they are, due to the obvious market implications.

*Id.*

On this tenuous showing, the Plaintiffs encourage us to deduce that a collusive agreement served to "alleviate" Childers' concerns. We are not so persuaded, however, for Childers' decision to increase the price of PCS potash by the industry average, rather than by its own, higher margin, does not meaningfully suggest that Childers' concerns, over PCS's competitiveness, had been effectively assuaged.

■ ii. *Response to PCS's Price Increase.* In addition to the size of the price increase, the Plaintiffs maintain that the "prompt response" by the other Defendants, as well as the fact that the increase was uniformly matched—and not undercut by the other potash producers—supports an inference of a conspiracy. We conclude, however, that an inference of conspiracy, which is based upon this showing, is unsound, particularly in view of the strong competing inference that the Defendants not only independently arrived at the $35 figure but, in doing so, they exercised understandable business judgment.

As we have noted, PCS announced the $35 price increase on September 4, 1987, and, by September 16, 1987, the remaining Canadian Defendants had followed suit. The Plaintiffs contend that "Kalium was aware of IMC's and Noranda's intention to increase their prices $35 before they announced," and that "Noranda was aware of Kalium's intention to raise prices before they announced as well." *Pltfs.' Jt.Opp.Memo.* at 4 n. 7. As evidence for these assertions, the Plaintiffs highlight a Kalium document, which is dated September 10, 1987, and which states: "IMC considering increase" and "Noranda rumored to go up also." *Kalium Document (AK 058720)*, attached as *Tab 3, Pltfs.' Jt.Opp.Aff.* The Plaintiffs also refer to a Noranda Memorandum, of September 4, 1987, which reports:

Rumors rampant this week about imminent price increase in U.S.A. Kalium reported prepared to publish revised price list $6–$10 U.S./ton higher than current level.

*Noranda Memorandum, dated September 4, 1987 (NOR 408818), attached as Tab 6, Pltfs.' Jt.Opp.Aff.*

Viewed in its own light, we are unable to infer from this evidence, without engaging in sheer speculation, that the Defendants provided advance notice of each others' pricing decisions, as the inference is equally plausible that Kalium and Noranda received the referenced "rumors" from their own customers. Not only was the Kalium price increase, which was listed in the Noranda Memorandum, inconsistent with the eventual $35 increase, but a Noranda document, which followed the first Memorandum by one week, stated as follows: "No definitely confirmed reports of price increases by other producers though rumors abound and make for interesting discussion." *Noranda Memorandum, dated September 11, 1987 (NOR 408815), attached as Exhibit 2, Defs.' Jt.Rep.Aff.*

■ The Plaintiffs also contend "that PCA knew *before* September, 1987 that the industry-wide $35 price increase was forthcoming." *Plaintiffs' Memorandum in Opposition to Rio Algom/PCA Joint Motion ("Pltfs.' Rio Algom/PCA Opp.Memo.")* at 4. To support this contention, the Plaintiffs point to a telex, which was dated August 27, 1987, and which was transmitted by J.P. Welch ("Welch"), who was PCA's Western Regional Manager, to J. Ripperger ("Ripperger"), the Vice President of Marketing and Sales at PCA. *PCA Telex (XC 01637),* attached as *Tab 5, Pltfs.' Jt.Opp.Aff.* In the telex, Welch states that he "cannot understand [PCA's] reluctance to take orders at current list price," and protests that "[PCA's] current policy is alienating our good customers, destroying morale among the salesmen and, most importantly, not moving one pound of potash." *Id.* Welch also expressed his fear that "while we are courageously supporting the industry vow of strengthening prices, we will again be left with an unsold inventory." *Id.* According to the Plaintiffs, PCA's policy of not making sales at list

prices "reflects PCA's foreknowledge that its competitors would be raising prices dramatically in the future." *Pltfs.' Rio Algom/PCA Opp.Memo.* at 4.

Without question, Welch's telex reveals a difference in opinion at PCA. However, on August 26, 1987—the day before Welch sent the telex—Ripperger advised his sales force that, effective immediately, no new orders were to be accepted. *Ripperger Telex (XC 152614),* attached as *Exhibit F, Rio Algom/PCA Jt.Memo., Declaration of Eric H. Queen ("Rio Algom/PCA Jt.Aff.")* Ripperger has explained that this direction was given "in order to allow PCA to clarify its situation vis-a-vis the DOC's ruling [the preceding] Friday." *Id.* Given this explanation, we conclude that a legitimate inference does not arise from PCA's decision, to withdraw sales into the United States as an immediate response to the DOC's announcement of preliminary margins, since contemporaneous documentation discloses a rational business motivation which supports that response.

Indeed, another contemporaneous Memorandum at PCA bolsters an inference that, rather than learning about each others' prices from one another, the Defendants discovered the pricing decisions of their competitors by reports from their own customers. *PCA Interoffice Memorandum (XC 74090),* attached as *Exhibit 51, Defs.' Jt.Memo.Aff.* The Memorandum, which is dated September 8, 1987, was sent from PCA's Eastern Regional Office to Ripperger, and provides as follows:

The following has been reported by customers to the Lebanon Regional Office this morning. Although we feel the information is accurately reported as the individual's best understanding of it, we would want additional time to confirm the factuality of the following: Sidney Clear, Southern States Coop, reported this morning PCS's price to them will be based on $58.00 per ton coarse, FOB mine site, plus a $35.00 per ton increase effective 9/7/87.

This Memorandum concludes with additional information, which pertained to the current potash pricing of one of PCA's rivals, and all of which was gleaned from third-party sources. In fact, the Memorandum reported

that "no information to this point regarding price changes from Kalium," which suggests, when read in composite, that the potash industry routinely relied upon customer reports in canvassing the pricing policies of competing interests. *Id.*

As additional, suggestive evidence that the $35 increase was coordinated among the Canadian Defendants, the Plaintiffs identify an interoffice Memorandum which memorializes a meeting that occurred on August 31, 1987, between Gordon and two Saskatchewan Government officials; namely, Smith and Bob Reid, who was a Deputy Minister of Energy and Mines. In this Memorandum, Gordon related that he "reiterated [his] disapproval of [the prorationing legislation], and again suggested that via PCS the government could have prices increased." *Gordon Memorandum (NOR 406038),* at *Tab 6, Pltfs.' Jt.Opp.Aff.* Notwithstanding the Plaintiffs' claims to the contrary, we find this evidence to be unsupportive of a conspiracy, since contemporaneous records reveal that PCS had decided to increase its price for potash on August 24, 1987—one week prior to the Noranda meeting. *Notes of Conference Call (PC 356389),* attached as *Exhibit 4, Defs.' Jt.Rep.Aff.* Moreover, the Plaintiffs have offered no evidence to refute Smith's statement that her discussions with Gordon—as well as her discussions and those of her staff, with the other potash producers—were held in strict confidence. *Declaration of Pat Smith* at ¶ 6, attached as *Exhibit 5, Defs.' Jt. Rep.Aff.*

■ As further supporting their supposition, that an industry agreement was formed to follow PCS's pricing lead, the Plaintiffs refer to an internal Memorandum, at Cominco, which is dated July 30, 1987, and which records a conversation between Reid and John Anderson, who was the President of Cominco. *Cominco Memorandum (CA 210335),* attached as *Tab 7, Pltfs.' Jt.Opp.Aff.; Pltfs.' Com.Memo.* at 2. In response to Reid's reference to the Provincial Government's intent to introduce prorationing legislation, Anderson commented as follows:

> I made the point that the price leadership being exhibited by the new management of PCS appears to be working and is accept-

ed in the marketplace. While basic fundamentals have not changed (with one important exception—potash producers have been so severely burned with losses that there may be much greater acceptance of price leadership and discipline in the market-place to prevent the recurrence of the previous two years). It is my feeling that the new pricing policies and apparent discipline of the market-place should be given an opportunity. If they fail at some future time, standby legislation as described above could be quickly put in motion. I think that my position fell on deaf ears.

In the absence of any evidence to responsibly suggest, however, that the Saskatchewan officials were being used by the Defendants as a conduit to privately communicate their individual pricing intentions to others in the industry, the Plaintiffs' attempt to portray a conspiratorial cast to the producers' separate discussions with the Provincial Government officials, in July and August of 1987, is unavailing. Likewise, we reject the Plaintiffs' entreaty that we infer a conspiracy from Anderson's use of the phrases "price leadership" and "discipline of the market-place." Without more, these phrases merely acknowledge, we think innocuously enough, the admitted interdependence of competing interests in any oligopoly, such as the potash industry.

■ The Plaintiffs have also isolated an internal analysis of the dumping margins, by Cominco, as supportive of their view that Cominco's decision to match the $35 increase was not reasonable unless there was a prior understanding within the industry. This Memorandum, which was dated September 11, 1987, was drafted by Dale Massie, who was Cominco's Vice President of Marketing, and it directed the Accounting Manager at Cominco to begin "accruing monies from the sale of potash to cover potential dumping fees." *Cominco Memorandum (CA 057930),* attached as *Tab 7, Pltfs.' Jt.Opp.Aff.* The Plaintiffs underscore that the handwritten calculations on this Memorandum, which reflect a $16 accrual for granular grade potash, evince a conscious decision by Cominco to ignore its own internal analysis of the dumping margins, when it elected to match PCS's

$35 increase on September 14. *Id.* We think the Plaintiffs' reliance on these calculations is misplaced, however, for neither they, nor the remainder of the Memorandum so much as suggest that Cominco intended to raise prices by $16—only that it sought to accrue that amount. *Id.* Of course, no conspiratorial inference is rationally prompted by a producer's failure to match a cost increase with an identical increase in price. Here, the unrebutted testimony of Cominco's management reveals that Cominco made its pricing decision without communicating with its rivals in the industry, and with the intent to achieve a competitive price level. *Deposition of David Benusa* at 230–31, attached as *Tab 16, Pltfs.' Jt.Opp.Aff.* Notably, except for this most attenuated argument, the Plaintiffs do not contend that it was unreasonable for Cominco to match PCS's price increase.

■ The Plaintiffs continue by arguing that IMC's and Kalium's decision to follow PCS's $35 increase made no economic sense, but for an agreement to fix prices. In the Plaintiffs' view, since IMC and Kalium were assessed preliminary dumping margins which were below both PCS's and the industry average, each of the firms should have exploited their competitive advantage by undercutting the $35 price increase. *Pltfs.' Jt. Opp.Memo.* at 10.

In response, the Defendants urge that the decisions by Kalium and IMC, to forego an undercutting of the $35 price increase, evinces a sound exercise of business judgment on each of their respective parts. To support this urging, the Defendants note that the Saskatchewan Government enacted prorationing legislation in September of 1987, and that Kalium and IMC were each concerned that an effort to subvert its competitors' prices could trigger a punitive application of this legislation. Indeed, in a September 10, 1987, interoffice Memorandum of

Christopher Williams ("Williams"), who was the Senior Vice–President at IMC, the trepidations of management were expressed as follows: "Primary concern for IMC is the threat of production controls—if we don't follow will the government go out of their way to hurt us?" *Williams Memorandum (ST 000001)*, attached as *Exhibit 9, Defs.' Jt.Rep.Aff.*[20] See also, *Deposition of Clifford Kelly* at 229, attached as *Tab J, Kalium Supplemental Memorandum, Transmittal Declaration of Lisa A. MacVittie ("Kal.Memo.Aff.")*.

Although the legislation was never implemented, the Plaintiffs have provided no evidence that IMC or Kalium had no cause for concern. Indeed, during July and August of 1987, Saskatchewan officials met separately with the Canadian producers to inform them about the potential impact of the prorationing legislation. *Declaration of Pat Smith* at ¶ 6, attached as *Exhibit 5, Defs.' Jt.Rep.Aff.* Following one of these meetings, Richard Hedberg, who was the Executive Vice–President of IMC, advised Reid that IMC was not in favor of Government control programs. *Hedberg Letter dated August 7, 1987 (MI 61170)*, attached as *Exhibit 5, Defs.' Jt. Rep.Aff.* Moreover, the Plaintiffs' contention, that Billie Turner, who was the President of IMC, "had no understanding that increasing IMC's market share would lead to production restraints," is clearly not supported by his deposition testimony. *Plaintiffs' Reply to IMC Memorandum* at 2, citing *Deposition of Billie Turner* at 144, attached as *Tab 51, Pltfs.' Jt.Opp.Aff.* In fact, in referring to the prorationing legislation, Turner testified that, "[h]aving a long history with that province, I had no question in my mind that they were prepared to take drastic action to protect their industry, particularly since they owned almost half of it." *Id.* at 147–48.

---

**20.** Referring to Williams' Memorandum as a "mystery" Memorandum, the Plaintiffs imply that it would not be admissible at Trial. The Plaintiffs' objections are threefold: it is incomplete in that it ends in mid-sentence; it was produced several months after IMC's other documents were produced, and it bears a Bates number that is out of sequence with those earlier documents; and, although it is dated September 10, 1987, it refers to events that are dated September 11, 1987. *Pltfs.' IMC Opp.Memo.* at 2–3. We do not agree that these asserted anomalies would, necessarily, render the Memorandum inadmissible but, in any event, the unrebutted testimony of the Memorandum's author, Kip Williams, reveals that IMC did not attempt to undercut the $35 increase because "we were concerned with the production controls." *Deposition of Christopher C. Williams* at 64, attached as *Tab 56, Pltfs.' Jt.Opp.Aff.*

In addition to its comprehendible concern over the potentiality of prorationing, Kalium asserts that any inference of collusion, based on its failure to cut prices so as to generate additional revenues, is negated by the fact that it was then operating at its maximum practicable capacity. *Kalium Supplemental Memorandum* at 4. Notwithstanding the Plaintiffs' expressed disbelief, the Record before us corroborates Kalium's claim that, during the relevant period, it was operating at or near full capacity—about 92 percent—for the coarse and granular grades of potash, which were the varieties that accounted for the vast majority of its market in the United States. See, *Deposition of Clifford Kelly* at 229, attached as *Tab J, Kal.Memo.Dec.;* and *Declaration of John Huber* at ¶¶ 12–18, attached as *Tab F, Kal.Memo.Dec.; Rausser Rept.* at ¶ 7, attached as *Tab 59, Pltfs.' Jt. Opp.Aff.* (coarse and granular grades accounted for 84% of the market during the 1983–1992 period).

For instance, compaction difficulties reduced Kalium's granular grade production from 91.1 percent to 86.1 percent in 1988. *Declaration of John Huber* at ¶ 16, attached as *Tab F, Kal.Memo.Dec.* Although the Plaintiffs suggest that Kalium should have installed compactors at a rate faster than one per year, the testimony of Kalium's expert, Frederic Scherer, remains unrebutted that it would have been counter-productive for Kalium to have added compactors at a faster rate than had been accomplished. *Deposition of Frederic Scherer* at 186, attached as *Tab K, Transmittal Declaration of Frederick S. Young, Kalium Supplemental Reply Memorandum ("Kal.Rep.Dec.").* Moreover, Kalium maintains that, because it utilized its fine and standard grades of potash in the production of the more lucrative granular variety, it lacked a compelling economic incentive to sell all of its fine and standard grades, and that, in any event, there is a direct correlation between the price of all of the potash grades in the industry. *Declaration of John Huber,* at ¶¶ 20 and 23, attached as *Tab F, Kal. Memo.Dec.* Nor have the Plaintiffs presented any evidence that IMC had the capacity to increase its sales volume, as would have to be the case if it were to profit from undercutting the $35 price increase. Given this Record, to

infer that IMC and Kalium would have obtained greater profits by underbidding the $35 price increase amounts to nothing other than conjecture.

Lastly, we think it worthy of reiteration, that an advance, collusive agreement is not an inevitable rationale for price matching in an oligopoly. In this respect, we find the reasoning of the First Circuit, in *Clamp–All,* worthy of reemphasis:

> A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader. After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all. One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.

*Clamp–All Corp. v. Cast Iron Soil Pipe Institute,* supra at 484. Based upon this same reasoning, the Seventh Circuit has held that it was not irrational for two insulation manufacturers to raise their prices in a period of reduced demand. *Reserve Supply v. Owens–Corning Fiberglas,* supra at 52. As was the case in the potash market, the demand for insulation, at least at the time of the Court's review in *Reserve Supply,* was inelastic. Therefore, the only new customers which would have been accessible were those who were currently being serviced by the defendants' competitors. In granting Summary Judgment for the defendants, the Court explained that the defendants' decision "to forego this option[,] [of cutting prices in an attempt to increase market share,] does not suggest that they 'acted in a way that, but for a hypothesis of joint action, would not be in [their] own self-interest.' " *Id.;* quoting *Illinois Corporate Travel Inc. v. American Airlines, Inc.,* 806 F.2d 722, 726 (7th Cir. 1986).

Accordingly, after careful review, we conclude that the explanations, of the low-margin producers, for deciding to follow, and not to undercut, the $35 price increase, are as economically plausible, or are more so, than the conspiracy-driven conclusion that the Plaintiffs would have us reach.

■ iii. *Entry Into Suspension Agreement.* The Plaintiffs claim, with the support of their expert, that the Defendants' participation in the Suspension Agreement creates an inference of conspiracy. *Rausser Rept. at ¶ 22, attached as Tab 59, Pltfs.' Jt.Opp.Aff.*[21] As had been their urging with respect to the decision of IMC and Kalium to match the $35 price increase, the Plaintiffs claim that the entry of the low-cost Defendants into the Suspension Agreement was an act of economic irrationality since, in accepting that Agreement, they failed to exploit a potential competitive advantage. We conclude, however, that the Plaintiffs' assertion is, again, a resort to unfounded supposition.

In Rausser's view, the Suspension Agreement destroyed the low-cost producers' competitive advantage in having low tariffs, because the Agreement "had the effect of requiring all producers to raise their prices equally." *Id.* However, Rausser's opinion is not supported by the plain language of the Agreement, which incorporated each producer's preliminary dumping margin in the Agreement price. Indeed, in his Supplemental Report, Rausser appears to acknowledge this point but, nevertheless, he maintains that, because the DOC did not monitor the individual firms, the agreement, in practical effect, imposed a single price floor. *Supplemental Expert Report of Gordon C. Rausser at ¶ 20, attached as Tab 60, Pltfs.' Jt.Opp.Aff.* Nonetheless, Rausser equivocates somewhat by opining that, if the Agreement imposed different price floors, "low margin firms have been giving away a competitive advantage on a daily basis by not pricing under the price floor of the high margin firms." *Id.*

Regardless of whether the price floor effectively required a single price, we find Rausser's argument to be unavailing, for it requires a factfinder to infer irrationality from the decision of low-cost producers to sacrifice market share for higher product prices. As we previously noted with respect

to Kalium, even if it had desired to expand its market share, it was logistically unable to do so. Moreover, there is ample evidence that, even after its entry into the Suspension Agreement, IMC was apprehensive that any attempt on its part to increase market share would trigger a price war which, in turn, could provoke the cessation of that Agreement, or the imposition of production controls, or both. See, *IMC BBT Letter— Strategic Issues/Planning (MI 45846), dated August 9, 1989* ("Dumping remains an issue—Market share concerns continue (production quotas)"); *IMC Strategic Issues Memorandum, dated October 18, 1989 (MI 0928300)* ("As you know, we have also been concerned about production controls if our market share moves up too far."); *IMC Strategies Memorandum (MI 45897), dated November 29, 1989* ("Revival of dumping investigation would only take place if the price of potash drops materially[;] [i]t is our objective, therefore, to keep the price of potash up as well as maintain our compliance with the guidelines provided under the suspension agreement."); *IMC Response to Issues Memorandum, dated December 7, 1989 (MI 45035)* ("To achieve a larger [market] share would risk dissolution of the Suspension Agreement and pose potential dumping concerns; [i]t could also lead to production controls."), attached as *Tab 2, IMC Reply Memorandum, Affidavit of John French ("IMC Rep.Aff.")*; *IMC Price Guidelines, dated August 23, 1990 (MI 7112)* (calculations of estimate minimum U.S. price guidelines relative to the suspension agreement), attached as *Exhibit 31, Defs.' Jt.Rep.Aff.*; *Suspension of Antidumping Duty Investigation: Potassium Chloride From Canada, Article V.C.,* 53 Fed.Reg. 1393, 1394 (January 19, 1988) ("the Department reserves the right to modify its methodology in calculating United States price and foreign market value."), attached as *Exhibit 35, Defs.' Jt. Memo.Aff.*

---

21. With respect to both PCA and Noranda, which were high-cost producers, the Plaintiffs' expert testified that each acted in a manner, that was consistent with their own self-interest, by entering into the Suspension Agreement. *Deposition of Gordon Rausser* at 539 and 655, attached as

*Exhibit 54, Defs.' Jt.Memo.Aff.* The following testimony is illustrative: "I believe PCA was above the average [of the preliminary dumping margins]. So the response to your question would be that they would prefer [to enter the Suspension Agreement]." *Id.* at 655.

Indeed, the Record discloses several occasions when IMC determined that it was unable to make a specific sale, or even to participate in a particular market, because of the Suspension Agreement. See, *IMC Memorandum, dated April 14, 1988 (MI 60513)* (observing that IMC is unable to participate in the Southeast); *IMC Memorandum, dated September 18, 1989 (MI 7798)* (stating that IMC either needs "better freight rates, take a different view on dumping, or hope for a big price improvement" to attract business in the Southeast); *IMC Letter to Customer, dated October 26, 1989 (MI 9409)* (refused sale); *IMC Letter to Customer, dated August 30, 1990 (MI 9367)* (refused sale), attached as *Exhibit 31, Defs.' Jt.Rep.Aff.*

The Plaintiffs' evidence, on this aspect of the Suspension Agreement, is ambiguous for an additional reason. As is the case with any settlement, the Suspension Agreement avoided an uncertainty, and the economic risks that attended that uncertainty. Had a final determination been entered against the Canadian Defendants, each producer would have been required to make a cash deposit on all exports to the United States which, depending upon the size of the margin, had the distinct prospect of significantly affecting the company's cash flow. See, *Title 19 C.F.R. § 353.21(b); Expert Report of William H. Barringer* at ¶¶ 6–8, attached as *Exhibit 59, Defs.' Jt.Memo.Aff.* Moreover, the dumping margins were preliminary, and were subject to reassessment, as is confirmed by the United States petitioners' request for an upward revision in some of the companies' margins. For IMC, these risks included the possibility that a recalculation of its duties would have included additional costs which, in turn, would have had the effect of raising its dumping margin. In this respect, Turner testified that if IMC's water costs were included in their margin, "we [would] not [be] the lowest producers by a long shot." *Deposition of Billie Turner* at 154–56, attached as *Tab 2, IMC Rep.Aff.* We cannot say that it was implausible for a Canadian potash producer to hedge against these risks.

Our conclusion on this point finds further support in the view taken by the United States Department of Justice, and by the Federal Trade Commission ("FTC"), that the entry of an Agreement to terminate a dumping action is entitled to an implied immunity from the applicable antitrust laws. *U.S. Department of Justice, U.S. Federal Trade Commission, Antitrust Enforcement Guidelines for International Operations* (April 1995) (Example M), attached as *Exhibit 61, Defs.' Jt.Memo.Aff.* Under the guidelines issued by the Justice Department and by the FTC, a scenario is addressed in which foreign producers are assessed preliminary dumping margins of 10 to 40 percent. *Id.* Thereafter, the foreign producers jointly initiate discussions with the DOC that lead to the suspension of the investigation. The suspension agreement provides that each producer will sell its product in the United States at a price not less than its individual foreign market value. Before determining to suspend the investigation, the DOC provides copies of the proposed agreement to the U.S. producers, who jointly advise the DOC that they do not object to the agreement on the proposed terms. According to the Justice Department, and the FTC, the hypothetical scenario envisioned no antitrust violation. In this respect, the Guidelines explain:

> While an unsupervised agreement among foreign firms to raise their U.S. sales prices ordinarily would violate the Sherman Act, the suspension agreement outlined above qualified for an implied immunity from the antitrust laws. As demonstrated here, the parties have engaged only in conduct contemplated by the Tariff Act and none of the participants have engaged in conduct beyond what is necessary to implement that statutory scheme.

Notably, the Plaintiffs have made no attempt to distinguish the present case from the scenario illustrated in the guidelines and, frankly, none readily comes to mind.

In sum, we conclude that the conduct of the Defendants, in entering the Suspension Agreement, was not a collusive act, and is as readily and plausibly explained by sound business practices, as it is by the Plaintiffs' suspicions of complicity.

iv. *NMP/Eddy Pricing Behavior.* Although not argued in their Joint Brief, the Plaintiffs contend that, by following the prices of their Canadian rivals, NMP/Eddy "failed to maximize the price advantage it had during the conspiracy period." *Pltfs.' NMP/Eddy Opp.Memo.* at 3. In the Plaintiffs' view, had NMP/Eddy acted in its own best interest, it would have exploited the Canadian producers' inability to lower their prices, under the Suspension Agreement, by increasing its U.S. sales "as much as possible." *Id.* at 4. Instead, the Plaintiffs' assert, NMP/Eddy continued to export much of its production despite receiving lower revenues from those sales. Upon close review, however, the Plaintiffs' evidence in this respect is inconsiderable, and what there is can be explained by reasonable business judgment.

Notwithstanding the Plaintiffs' theorizations, the Record demonstrates that NMP/Eddy increased its share of the United States potash market, at the expense of the Canadian producers, after the January 1988 Suspension Agreement. See, *Expert Report of Louis A. Guth* at Exhibit 16 (showing NMP/Eddy's domestic market share increasing from 4.78 percent, in 1986, to 9.08 percent, in 1989, whereas the Canadian producers market share dropped from 80.15 percent to 68.11 percent, over the same period), attached as *Exhibit Q, NMP/Eddy Jt. Memo.Aff.; Deposition of Gordon Rausser* at 1033 (conceding that NMP/Eddy increased sales after the Suspension Agreement at the Canadian producers' expense in the mid-South and Midwestern United States), attached as *Exhibit 1, NMP/Eddy Reply Memorandum, Affidavit of Steven A. Marshall ("NMP/Eddy Jt.Rep.Aff.")*

Moreover, while it is true that NMP/Eddy received lower revenues from its export sales, in comparison to its sales made in the United States, the Plaintiffs' argument ignores the fact that NMP/Eddy's mines produced a disproportionate amount of the standard grade of potash. See, *Expert Report of Louis A. Guth* at Exhibit 23, attached as *Exhibit Q, NMP/Eddy Jt.Memo.Aff.; Deposition of Niven Morgan* at 57 ("[W]e didn't have * * * much capability on what we produced, and we produced more standard than

anything else, even though we didn't want it."), attached as *Exhibit 3, NMP/Eddy Jt. Rep.Aff.* However, as the Plaintiffs' expert has admitted, because there is little demand in the United States for the standard grade of potash, most potash exported out of the United States consists of that grade. *Deposition of Gordon Rausser* at 1009–1010, 1021, attached as *Exhibit 1, NMP/Eddy Jt. Rep.Aff.; Deposition of Niven Morgan* at 58 ("[Standard] was a product that had very little demand in the United States any longer."), attached as *Exhibit 3, NMP/Eddy Jt. Rep.Aff.* This evidence reveals that, in reality, NMP/Eddy had little alternative but to sell their inventory of standard grade potash to its export market. In addition, the evidence reveals that NMP/Eddy had not abandoned the United States market, for they were engaged in efforts to increase their capacity to produce the more desired grades of potash. *Expert Report of Louis A. Guth* at ¶ 33, attached as *Exhibit Q, NMP/Eddy Jt.Memo.Aff.*

The Plaintiffs next refer to a Memorandum, dated December 31, 1991, from Dean McWilliams ("McWilliams"), who at that time was the Executive Vice President of NMP, to Dick Marshall ("Marshall"), who was then a new sales representative, as demonstrating that NMP/Eddy had failed to exploit the Canadian producers' inability to lower their prices. In this Memorandum, McWilliams notes that NMP's prices did not match those of its Canadian rivals, and he authorized Marshall "to meet prices, at the dealer level, which net back to Carlsbad the posted Canadian price F.O.B. mine." *NMP Memorandum (MN 003551)*, attached as *Tab 8, Pltfs.' Jt.Opp.Aff.* Contrary to the Plaintiffs' assertion, however, this Memorandum does not limit potash sales at these prices but, rather, simply advises Marshall that "[a]ny other competitive pricing will require [McWilliams'] approval." *Id.* We conclude that this Memorandum reveals nothing more than a limitation, that was placed on Marshall, in deviating from NMP's price list.

In light of the evidence of Record, that NMP/Eddy increased its domestic market share, at the expense of their Canadian rivals, and further, that it had no alternative

but to export much of the potash that it produced, we conclude that the Plaintiffs' contention, that NMP/Eddy acted contrary to its economic self interest by not increasing sales "as much as possible," does not raise a reasonable inference that NMP/Eddy participated in an alleged conspiracy.

 v. *Refund of Surcharge and $18 Increase.* After they entered into the Suspension Agreement, all of the Canadian producers rebated the $35 surcharge, and increased their potash prices by $18. We are asked by the Plaintiffs to conclude that this could not have occurred without a prior agreement to that effect.

As evidence of a coordinated price increase, the Plaintiffs cite a Canpotex Memorandum, that is dated January 8, 1988, and that is directed to its "agents and officers." *Canpotex Memorandum (CTX 1229),* attached as *Tab 9, Pltfs.' Jt.Opp.Aff.* The Memorandum provides as follows:

> FYI Canadian potash producers have reached agreement with the United States Department of Commerce and all dumping action has been suspended for a minimum of 5 years. It is rumored that the USD 35.00 per metric ton increase posted by Canadian producers in 1987 to cover possible tariff payments to the U.S. Govt will be refunded in full or part. In the meantime new price lists are being issued on Monday Jan. 11 at: Standard Grade USD 80.00; Coarse Grade USD 84.00; Granular Grade USD 86.00.

By January 22, 1988, all of the Canadian Defendants, with the exception of Kalium, had issued price lists with prices that matched those announced in the Canpotex Memorandum.[22] The Plaintiffs infer, from the contents of this Memorandum, that all of the Defendants had previously agreed to charge these prices. However, on the same date that Canpotex issued this Memorandum, PCS announced these prices, in a telex to its customers, which advised that "[p]rice lists [would] be mailed on Monday, January 11." *Telex to Customer (NOR 416856),* attached as *Exhibit 11, Defs.' Jt.Rep.Aff.* As a conse-

quence, the Memorandum does not assist the Plaintiffs in proving the existence of an alleged conspiracy, since it does not tend to exclude the possibility that Canpotex learned of the price lists from a customer of PCS.

Further negating an inference of conspiracy is the undisputed evidence that the Canadian producers did not uniformly increase their prices on January 11, but rather, they announced their price lists at various dates throughout the following eleven days. See, e.g., *Kalium Price List effective January 11, 1988, dated January 11, 1988 (AK 620389),* attached as *Tab 3, Pltfs.' Jt.Opp.Aff.; Cominco Price List effective January 11, dated January 12 (CA 53361),* attached as *Tab 7, Pltfs.' Jt.Opp.Aff.; Noranda Price List effective January 11, dated January 14 (NOR 00000021),* attached as *Tab 6, Pltfs.' Jt.Opp. Aff.; IMC Price List effective January 18, undated (MI 094090),* attached as *Tab 4, Pltfs.' Jt.Opp.Aff.; PCA Price List effective January 18, dated January 22 (XC 168657),* attached as *Tab 5, Pltfs.' Jt.Opp.Aff.* Of course, evidence that the alleged conspirators were aware of each other's prices, before announcing their own prices, "is nothing more than a restatement of conscious parallelism, which is not enough to show an antitrust conspiracy." *Market Force Inc. v. Wauwatosa Realty Co.,* supra at 1172 (evidence that real estate brokers had circulated information about each others' commission policies, and that commissions tended to become uniform after this information had been circulated, was not sufficient to show a conspiracy).

The Plaintiffs have also presented evidence, which they believe demonstrates that NMP had advance notice of the potash prices prior to their announcement, by the Canadian producers, in January of 1988. As we have addressed, shortly after the entry of the Suspension Agreement, the Canadian producers raised their price for potash by $18, so as to reach a total price of $86 per ton on the granular grade of potash. On September 15, 1987, NMP issued price lists which contained one price that would be effective

---

**22.** Kalium's price list reflected prices for each grade of potash which were one dollar higher than that announced in the Canpotex Memoran-

dum. *Kalium January 11, 1988 Price List (AK 620389),* attached as *Tab 3, Pltfs.' Jt.Opp.Aff.*

through December 31, 1987, and a higher price that would be effective from January 1, 1988, forward. Given these pricing decisions, the Plaintiffs have directed our attention to NMP's announced January price of $92.50, which they assert was "virtually the exact price required to place the American producers at the traditional differential of approximately $6 between Canadian and American prices." *Pltfs.' Jt.Opp.Memo.* at 10. While it is true, that the Record supports the fact that Canadian and American potash prices traditionally varied by $6, see, *Deposition of Niven Morgan, Jr.* at 30, attached at *Tab 38, Pltfs.' Jt.Opp.Aff.*, it remains implausible that, in September of 1987, when NMP issued its price list, it could have clairvoyantly known that the DOC, and the Canadian producers, would reach an agreement in the following January, let alone what the impact that settlement agreement would have upon the price of potash. Indeed, the margins were announced only several weeks before NMP announced its January potash prices, and well before any settlement negotiations had even taken place. Given this inconceivability, we are compelled to conclude that a factfinder should not be allowed to infer, on nothing more than a hunch, that NMP was privy to pricing information prior to its public announcement. See, *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.*, supra at 1121 (quoting *VI Areeda* § 1425 at 146) (To infer a conspiracy from parallel behavior, the conduct "cannot arise from a 'plausible coincidence or an expectable response to a common business problem.'").

Lastly, the Record makes clear that the Defendants did not conspire to rebate the surcharge.[23] While PCS initially promised that it would refund the surcharge in the event that the duties should not, ultimately, be imposed, the remaining producers, albeit with reluctance and under pressure from their customers, decided to follow suit, although not on uniform terms. See, e.g., PCS

Letter dated February 23, 1988 (PC 24093) ("At the time we added the $35.00 to our prices we indicated to our customers that if the investigation ended without a requirement that we pay the duties we would return to our customers the surcharge amounts they had paid."), attached as *Exhibit 52, Defs.' Jt.Memo.Aff.; Kalium Letter dated January 15, 1988 (AK 101641)* credit notes to be issued "reflecting the spring price for your fall purchases with appropriate early purchase discounts and an additional credit of 1% per month to cover your cost of money", attached as *Exhibit 13, Defs.' Jt.Rep.Aff.; PCA Memorandum dated February 2, 1988 (XC 228129)* (refund to be issued only where and when necessary, "as the result of a previous agreement or due to competitive pressure"), attached as *Exhibit 13, Defs.' Jt.Rep.Aff.; PCA Memorandum dated March 9, 1988 (XC 150364)* ("The IMC and PCS approach to the $35.00 rebate is literally a dagger at our throats['] [for,] [i]f we attempt to come out with a less lucrative program in the eyes of the market, then I am afraid we will place ourselves permanently at the end of the suppliers' line."), attached as *Exhibit 13, Defs.' Jt.Rep.Aff.; Noranda Memorandum dated November 10, 1987 (NOR 475571)* ("We will consider making retroactive price adjustments after conclusion of the dumping case is final if this is necessary to maintain a competitive pricing policy; but it is not our policy that this will be initiated or automatic on Noranda's part even if the outcome of the dumping case is positive."), attached as *Exhibit 13, Defs.' Jt.Rep.Aff.* Accordingly, even if there was a conspiratorial agreement amongst the Defendants to fix prices, the agreement did not include any decision to refund the $35 surcharge, and the Plaintiffs' claim on that ground must fail.

■ vi. *PCS's Decision to Supply PCA with Potash.* Next, the Plaintiffs argue that PCS's decision, to supply PCA with potash

**23.** In fairness, at the Hearing on this Motion, Plaintiffs' counsel disavowed any claim of conspiracy that was predicated upon the Defendants' decision to rebate the surcharge. See, *Transcript of Summary Judgment Hearing* at 107 ("They didn't conspire to give back the 35, but they conspired to raise it 35 bucks but some of them gave it back, you know, kicking and screaming.")

Nevertheless, the Plaintiffs' Memorandum pointedly implies that the occurrence of the rebates suggested a prior agreement, as follows: "The circumstances surrounding the Suspension Agreement and the attendant price rollback are also indicative of a conspiracy." *Pltfs.' Jt. Opp.Memo.* at 11.

for resale during the period, in 1987, in which PCA's mine was flooded, makes no economic sense. In support of this argument, the Plaintiffs assert that, without an independent source of potash, PCA would not have been able to service the supply needs of its customers. In the Plaintiffs' view, since other potash producers were operating with substantial excess capacity, these producers would have been able to supply PCA's customers and, thereby, to acquire PCA's market share. *Rausser Rept.* at ¶ 20, attached as *Tab 59, Pltfs.' Jt.Opp.Aff.* Accordingly, the Plaintiffs maintain that, rather than co-opting PCA's customers, PCS chose to supply PCA with potash, at "substantially less profit to PCS than PCS could have made simply by supplying some or all of PCA's customers itself." *Pltfs.' Jt.Opp.Memo.* at 39.

The most that we can say about this transaction, between PCS and PCA, is that it has an enigmatic basis. For one, PCS agreed to enter into its supply agreement with PCA in February of 1987, which was not only prior to Childers' arrival at PCS, but also several months before the date of the alleged conspiracy. More importantly, however, contemporaneous PCS documents disclose PCS's concern that PCA would be supplied by one of its rivals, if PCS did not agree to do so. On February 3, 1987, PCS internally reported that, "[i]f PCA is seriously considering reopening the mine, they will probably want to maintain their marketing organization by purchasing product from other producers." *PCS Interoffice Memorandum, dated February 3, 1987 (PC 3311),* attached as *Exhibit 15, Defs.' Jt.Rep.Aff.*

Thereafter, on February 5, 1987, an interoffice PCS Memorandum, which was directed to Holzkaemper, who then served as the president of PCS, stated that "[w]e stand the risk that competitors will bid at very attractive prices for specific portions of the business and their cherry-picking may allow them to offer more attractive prices than PCS Sales." *PCS Interoffice Memorandum, dated February 5, 1987 (PC 74926),* attached as *Exhibit 15, Defs.' Jt.Rep.Aff.* This same concern was reiterated during a meeting of PCS's Board of Directors, on March 4, 1988.

As reported in the notes of that meeting: "If [PCA] had not been able to purchase product from PCS Sales it would have purchased the product elsewhere as there was sufficient excess capacity available to meet PCA demand either from within the Canadian potash industry or offshore or a combination." *PCS Meeting Notes (PC 69787),* attached as *Exhibit 15, Defs.' Jt.Rep.Aff.* These meeting minutes also reveal that PCS earned a profit from its sales to PCA. *Id.* ("The contract with PCA returns a profit to PCS Sales.") Given these circumstances, and in view of the absence, in this Record, of any showing that PCS could, in fact, have done better by soliciting PCA's customers, we conclude that an inference of a conspiracy, on the basis of this transaction, would invoke impermissible speculation.

vii. *December of 1989 Price Decrease.* The Plaintiffs propose that PCS sharply reduced its potash prices, in December of 1989, in order to retaliate against "those who broke ranks." *Pltfs.' Jt.Opp.Memo.* at 24. In fact, on December 18, 1989, PCS did institute what it termed a "Market Correction Program," which reduced the price of potash by $18. In a letter of the same date, Carlos Smith ("Smith"), who was the Director of U.S. Sales at PCS, advised that the price reduction would be available for only five days. See, *PCS Smith Letter (AK 102128),* attached as *Tab 3, Pltfs.' Jt.Opp.Aff.*

In contrast to the conclusion that the Plaintiffs would have us reach, contemporaneous documents, as well as deposition testimony, show that the price reduction program was designed, at least in part, to stabilize the market price for potash. First, the Smith letter concludes with the following statement of purpose: "We believe this program will be beneficial to our customers by helping to stabilize the market so we all may be in a position to profit from what promises to be a good spring 1990." *Id.* In addition, Smith echoed his belief, during the course of his deposition, that the program was "to try to level pricing." *Deposition of Carlos Smith* at 133–38, attached as *Tab 47, Pltfs.' Jt. Opp.Aff.* The following excerpt, which was cited in the Plaintiffs' Memorandum, is illustrative:

Q: Well, was [the] market correction program meant to level just PCS's prices?

A: Industry.

Q: It was meant to level the industry prices, PCS, IMC, Noranda and the rest of them, correct?

A: Yes.

Q: I don't mean to leave anybody out. Okay. And did it work?

A: It leveled them.

\* . \* \* \* \* \*

Q: When you say level it, was it an attempt to stabilize prices?

A: Yes.

Q: And when you say stabilize the market, you're talking about stabilize the price of all PCS and its competitors?

A: Yes sir.

Moreover, a PCS Memorandum of April 11, 1990, from Smith, Gary Snyder ("Snyder"), who was PCS's Account Manager, and Jerry Jackson ("Jackson"), who was PCS's Director of National Accounts and Field Sales, to all of PCS's district and account managers, discloses that PCS sought to stabilize the market prices in order to obtain its full list price. *PCS Memorandum (PC 023104)* ("Looking back to the Market Correction Program and its purpose is just a reminder that our primary objective then and now is to obtain full list price."), attached as *Tab 2, Pltfs.' Jt. Opp.Aff.; Deposition of Jerry Jackson* at 150, attached as *Tab 32, Pltfs.' Jt.Opp.Aff.*

■ Standing alone, however, an attempt by one member of an oligopoly to exercise price leadership, by reducing its price, is not unlawful. As the Supreme Court recently observed, in *Brooke Group v. Brown & Williamson Tobacco,* 509 U.S. 209, 223–24, 113 S.Ct. 2578, 2587–89, 125 L.Ed.2d 168 (1993), it would be an unsound expression of antitrust policy to discourage a price leader, in an oligopolistic market, from reducing its price. The Court explained:

Even in an oligopolistic market, when a firm drops its prices to a competitive level to demonstrate to a maverick the unprofitability of straying from the group, it would be illogical to condemn the price cut: The antitrust laws then would be an obstacle to the chain of events most conducive to a breakdown of oligopoly pricing and the onset of competition. Even if the ultimate effect of the cut is to induce or reestablish supracompetitive pricing, discouraging a price cut and forcing firms to maintain supracompetitive prices, thus depriving consumers of the benefits of lower prices in the interim, does not constitute sound antitrust policy.

*Id.*

As a result, evidence that PCS lowered its price, in a unilateral effort to stabilize the price of potash, does not, by itself, support a reasonable inference of conspiracy. Indeed, as Rausser has testified, retaliatory behavior by one supplier against a rival is not, necessarily, collusive behavior. *Deposition of Gordon Rausser* at 739, attached as *Exhibit 54, Defs.' Jt.Memo.Aff.* Moreover, while it is not possible to ascertain what constituted a "supracompetitive price," the Defendants assert, and the Plaintiffs do not controvert that, "[a]t the time of the filing of the complaints, U.S. potash prices were lower than at any point since the price war that prevailed in the mid–1980s, before the initiation of the antidumping proceeding." *Defs.' Jt.Memo.* at 11.

Nevertheless, the Plaintiffs proffer evidence which they claim demonstrates that the Market Correction Program was aimed at producers who cheated in the marketplace by making "sales at lower prices \* \* \* after a December 1 'cutoff date.' " *Pltfs.' Jt. Opp.Memo.* at 24. To support this claim, the Plaintiffs offer a handwritten note of John Huber ("Huber"), who was the President of Kalium, which contains the following language:

1) Program was a market correction. Weren't trying to teach other people—only got tired of people who kept chipping away.

2) Program was reasonable one. Checked with people.

3) People started cheating. Ind. Farm Bureau—own program. Hudson by Amax and MCC—25 barges. [Kaiser] Estech—Israeli vessels.

4) We wanted to get their attention. Program to be short, very specific.

5) IMC extended to 29th.

6) Didn't want shipments after Dec. 1.

7) Will do everything we can to promote profitability. If gains continue, another program.

8) There running at 46% of capacity.

9) Have idle capacity more than IMC's [illegible].

10) Dumping—lowered cost—30 percent. Equity to Debt—10 to 1.

*Huber Note (AK 026115)*, attached as *Tab 3, Pltfs.' Jt.Opp.Aff.; Deposition of John Huber* at 132–33 (read document into the record), attached as *Tab 31, Pltfs.' Jt.Opp.Aff.*

We believe that this document creates no dominant inference in either proving, or disproving, the existence of a conspiracy. First, Huber testified that he received this information from a customer. *Deposition of John Huber* at 134, attached as *Tab 31, Pltfs.' Jt.Opp.Aff.* Indeed, as may be expected, the price reduction spawned much discussion in the market. See, *IMC Managers Report (MI 31528)* ("PCS prices have dominated activity last week."); *PCS Memorandum dated December 18, 1989 (PS 214568)* (informing Smith of Kalium's, IMC's, and Cominco's likely reactions to price cut, gleaned from conversation with customer), attached as *Exhibit 31, Defs.' Jt.Rep.Aff.*

Second, it is not disputed that PCS sought to be the price leader in the industry, nor, as *Brooke* has plainly established, is it unlawful for PCS to seek to stabilize the market, even if the effect would be to "forc[e] firms to maintain supracompetitive prices." [24] *Brooke*

*Group v. Brown & Williamson Tobacco*, supra at 224, 113 S.Ct. at 2588–89. Third, it remains uncertain what conduct was referenced by the terms "cheating" and "chipping away." Although this language may allude to conduct which deviated from an unlawful conspiracy, it is equally reasonable to read the terms as referring to a general price deterioration, or to prices that were lower than those that were allowed under the Suspension Agreement. Moreover, it cannot be intelligibly ascertained who had been "cheating." See, e.g., *Cominco Memorandum dated October 16, 1992 (CA 012463)* ("Resellers will be trying to chip away at the above prices—hopefully, the major producers will not allow this to happen."), attached as *Tab 7, Plts.' Jt.Rep.Aff.*

Lastly, the inference suggested by the Plaintiffs is further undermined by a contemporaneous IMC strategic plan document. *PCS Strategic Plan (MI 45907)*, attached as *Exhibit 31, Defs.' Jt.Rep.Aff.* Dated December 27, 1989, the document addresses IMC's assessment of PCS's market behavior, in the following terms:

We consider PCS's recent (December) market behavior to be a short-term aberration to their desired goals.

\* \* \* \* \* \*

[IMC's] position will be to support PCS pricing efforts as long as their efforts are realistic. We will lead if PCS's approach is not in [IMC's] best interest.

---

24. Thus, evidence that PCS viewed the Market Correction Program as the "2 × 4 approach" does not assist the Plaintiffs in establishing that the Program was intended to retaliate against those firms which departed from the alleged conspiracy. *PCS Handwritten Strategy Memorandum, undated (PC 292882–83)*, attached as *Tab 2, Pltfs.' Jt.Opp.Aff.* Rather, this document merely shows that the Program was implemented in furtherance of PCS's goal of being the price leader. The reference to the "2 × 4" approach is listed with "Raised Prices $35" and "Gave Rebates—Left Price up $18" under the heading "Re-examine Our Strategy—Should We Be Bold Enough to Take Drastic Action Again?" *Id.* Notably, the Memorandum goes on to report that "prices continue to deteriorate." *Id.*

Likewise, we cannot draw a reasonable inference of conspiracy from a Noranda Memoran-

dum that records a conversation between the author, who appears to be a Noranda employee, and an employee at PCS, which occurred at the Saskatchewan Mining Association, in February of 1990. *Noranda Memorandum (NOR 167913)*, attached as *Tab 6, Pltfs.' Jt.Opp.Aff.* Referring to this conversation, the Memorandum states:

Casual conversation at the SMA meeting with a fairly senior PCS guy got quite pointed about the "market correction plan" and he was happy to indicate that they could do it again and to lower price levels because they were more efficient than the rest of us and didn't have to worry about the DOC at levels that would cause the other producers to "dump."

In our view, this Memorandum is consistent with PCS's intent to use the Program as a means to stabilize market prices.

On its face, this document reveals that IMC did not view the price reduction as a means by which PCS would retaliate against co-conspirators so as to reestablish an agreed-upon price. Given these starkly competing inferences, we conclude that premising a conspiracy upon the language contained in the Kalium document would allow impermissible surmise to supplant responsible factfinding.

viii. *Transformation of Industry During 1987.* In addition to "uncharacteristically parallel pricing behavior," the Plaintiffs advert to other developments in the potash industry, in early 1987, which, they claim, are probative of a conspiracy. These developments include a new emphasis upon list prices, the elimination of discounts, and industry-wide cutbacks.

As a preliminary observation, we cannot draw an inference of conspiracy from the Plaintiffs' assertion that "uncharacteristically parallel pricing" commenced in 1987. *Pltfs.' Jt.Opp.Memo.* at 11. As the Plaintiffs themselves have acknowledged, prices in an oligopoly tend to be uniform and, in fact, they have been uniform throughout the history of the potash industry. Although several attempted price hikes, in 1986, were later rescinded after industry participants failed to follow along, the mere fact that Canadian producers "raised prices and the increase struck," after the arrival of Childers and Doyle at PCS in the spring of 1987, proves nothing more than interdependence in an oligopolistic marketplace. *Pltfs. Jt.Opp.Memo.* at 1. While the amount of the increase, in September of 1987, was exceptional, by not providing the amount of the price increase in the Spring of 1987, the Plaintiffs ask that we infer a price fixing conspiracy based on the mere fact that prices increased. As we have repeatedly observed, however, such business behavior is insufficient to establish an agreement to fix prices.

The Plaintiffs' next claim that, "[b]y May of 1987, coincident with the arrival of Childers and Doyle at PCS, there emerged a new found industry-wide emphasis on list prices for potash." *Pltfs.' Jt.Opp.Memo.* at 12. To support this assertion, the Plaintiffs cite a passage from an article, that was published in a trade publication, in which Doyle, who

was the President of PCS Sales, is quoted as stating:

> "When I first came on board in the Spring of 1987, the first word I put out to our sales force was that the price list was our price, stick to that price and no bending. Anybody who bends was out of here," Doyle says.

"Tough Decisions Return Balance to the Bottom Line," *Custom Applicator,* Feb. 1989, attached as, *Exhibit 24, Defs.' Jt.Memo.Aff.*

However, the article continues by quoting Childers' explanation of a legitimate business reason for an emphasis upon price lists:

> "Our philosophy is that our customers are better off as long as they have a steady system where they can depend on one price and one price list," [Childers] says. "If we say the price is $122, then that's what it is going to be. Our customer needs to have confidence in us and our price list."

*Id.*

The fact that PCS's emphasis on list prices was predicated on a legitimate business purpose renders the probative weight of that practice, in proving the existence of a conspiracy, to be equivocal, at best.

The inference that the Canadian Defendants colluded, in part, by emphasizing price lists, is also subverted by the absence of evidence that the strategy was pursued by the other producers. Indeed, the only other evidence, that is proffered by the Plaintiffs, is a March of 1987 internal Memorandum from IMC, which lists, in part, the following objectives:

> Reduce the amount of the discount and the number of discounted buyers. Be more selective in who we sell placing less product in the hands of the re-seller. Restrict the number of re-sellers pulling out of IMC warehouses. *Put pricing back in the hands of the producer.* Eliminate large swings in price which permit the re-seller to buy large quantities of product prior to a planned price increase, permitting him to undersell and delay the price from moving up.

*IMC Objectives Memorandum (MI 013536)*, attached as *Tab 4, Pltfs.' Jt.Opp.Aff.* [Emphasis Supplied in Plaintiffs' Brief].

Contrary to the Plaintiffs' pinched reading, we construe the highlighted language as more naturally meaning that IMC "put pricing back in the hands of the producer," not through the use of price lists, but by a reluctance to sell to "re-sellers." Moreover, an IMC interoffice Memorandum of December 3, 1991, supports the opposite inference— that is, an overall disillusionment with price lists. In that Memorandum, Steve Hoffman ("Hoffman"), who was the Senior Vice President of Sales at IMC, observed: "Since the mid 1980's, domestic potash pricing has evolved from sacrosanct price lists to a total disregard for their credibility." *Hoffman Memorandum (MI 48458)*, attached as *Exhibit 31, Defs.' Jt.Rep.Aff.* Thus, while the evidence suggests that PCS publicized its intention to not deviate from list prices, there is no evidence that the Defendants reached any understanding, by which each agreed to adhere to list prices so long as their competitors did. Indeed, the evidence favors the opposite inference.

Further, we conclude that the Plaintiffs' assertion that, in the Spring of 1987, the Defendants "coordinated the elimination of long-standing discount practices," likewise suffers from a dearth of evidentiary support. *Pltfs.' Jt.Opp.Memo.* at 12. For this proposition, the Plaintiffs reference a PCA interoffice Memorandum of July 8, 1987, from James Brown, who was employed in the Eastern Regional Office of PCA, to the Eastern District Managers. *Brown Memorandum (XC 000498)*, attached as *Tab 5, Pltfs.' Jt.Opp.Aff.* In this Memorandum, Brown advises that PCA's senior management had made clear that discounts, which had been given for prompt payment, would only be given for payment that was received within the stated time period. Referring to this policy, Brown states: "It is our intent and obviously the industry's practice henceforth to exercise this procedure firmly and it is up to each of us to make sure our customers clearly understand this procedure." In our view, Brown's Memorandum reveals nothing more than a recognition of the pricing poli-

cies of PCA's competitors and, therefore, this evidence is ambivalent.

Equally nonprobative of any agreement, among the Defendants, to abolish long-standing discount practices, is the Plaintiffs' reliance upon a Noranda Memorandum of June 5, 1987. This Memorandum reports that, with the exception of "summerfill incentive discounts," PCS will no longer permit discounts, "however general consensus that there may be some form of a National Discount." The Memorandum also reports that neither IMC nor Cominco had specified national discounts, although they "may surface later in some form." *Noranda Memorandum (NOR 118422)*, attached as *Tab 6, Pltfs.' Jt.Opp.Aff.* While the document suggests that PCS, under the new management of Childers and Doyle, had unilaterally reduced the number of available discounts, it does not reasonably support an inference that the Defendants illegally coordinated the elimination of any well-established discount practice.

As a further aspect of what the Plaintiffs have regarded as a transformation in the potash industry, they assert that the "spring of 1987 brought industry-wide production cut-backs." *Pltfs.' Jt.Opp.Memo.* at 13. To support this suggestion, the Plaintiffs have referenced a Memorandum from George Jones to John Gordon, both of whom were Vice–Presidents at Noranda, which discusses the background market conditions which led to Noranda's financial problems. *Noranda Memorandum (NOR 438284–87)*, attached as *Tab 6, Pltfs.' Jt.Opp.Aff.* The Plaintiffs have quoted the following passage:

> The losses by producers and the planned cutbacks by Cominco, Saskatoon, IMC, the 50 percent operating rate of PCS, curtailed operations at Kalium and the potential closure at [Noranda] would all combine to indicate the possibility for price stability.

However, any inference, that may have otherwise arisen from this document, is substantively eviscerated by the fact that the document should, correctly, be dated "November 17, 1986," and not "November 17, 1987," as the Plaintiffs' had understood. *Noranda Memorandum (NOR 438284–87)*, attached as *Tab 6, Pltfs.' Jt.Opp.Aff.* Accordingly, the document verifies that the Canadian produc-

ers, aware of the oversupply problems in the industry, had begun to limit production well in advance of the date that the Plaintiffs have alleged as being the start of the purported conspiracy.

To be sure, as the Plaintiffs have asserted, production "shutdowns continued in later years." *Pltfs.' Jt.Opp.Memo.* at 14. As but one example, the Plaintiffs direct us to a Cominco Report, of potash operations, in June of 1989. In relevant part, the Report advises:

> The entire industry is taking extended summer shutdowns to get inventories to an acceptable level, and we must do the same. We have scheduled a 6–week shutdown this summer. Politically, we cannot be seen to be taking less stringent measures to stabilize prices and inventories than our Saskatchewan competitors.

*Cominco Memorandum (CA 265270),* attached as *Tab 7, Pltfs.' Jt.Op.Aff.*

In our view, rather than support an inference of unlawful complicity, the quoted segment reveals Cominco's intent to follow the market. In any event, the decision to reduce production is precisely the type of conduct that routinely is influenced by independent self-interest. In addition to the proper business interests of reducing supply, the production shutdowns had the added effect of staying governmental intervention in the marketplace, as the same Report recounts: "The government has not proceeded with establishment of the production review board or regulations having stated they are satisfied with how the industry is maintaining discipline." *Id.*

■ In bolstering their claim, that the Defendants unlawfully agreed to cutback production, the Plaintiffs quote the following passage from a 1993 Report, that was disseminated by the Mineral Policy Sector of Energy Mines and Resources Canada:

> Over the last four years, operating rates in the Canadian potash industry declined to average 60% of total installed capacity. Since 1987, Canadian producers have been managing production in an attempt to stabilize world markets and prices; potash supply capability has been exceeding world

demand for the last decade and is projected to continue to exceed it until the end of this decade.

*Energy Mines and Resources Canada Report (CTX 1526),* attached as *Tab 9, Pltfs.' Jt.Opp.Aff.*

Nonetheless, "[t]he fact that many, if not all, firms in an industry react similarly to a particular practice does not evidence an industry-wide agreement when there is a legitimate business purpose for each firm's behavior." *Richards v. Neilsen Freight Lines,* supra at 904. We conclude, therefore, that because the oversupply of potash was a legitimate business concern, each of the Defendants had a proper economic motive in reducing their production. Thus, the Plaintiffs' evidence is of dubious weight since it denotes individual motivation as much as it evidences conspiratorial conduct.

Lastly, the Plaintiffs point to two internal Noranda Memoranda to support their contention that the "Spring of 1987 brought new recognition of industry unity." *Pltfs.' Jt. Opp.Memo.* at 20. On June 27, 1987, a Noranda internal weekly Report observed:

> Buyer sentiment towards the potential firmness in the potash market is mixed. The potash market has been a buyers market for so long that these buyers are resisting the discipline the producers *collectively* are attempting to enforce.

*Noranda Report (NOR 407425),* attached as *Tab 6, Pltfs.' Jt.Opp.Aff.* [Emphasis in Plaintiffs' Brief].

A subsequent internal weekly Report, that is dated July 24, 1987, expresses a similar view:

> The mood of the Southwestern Fertilizer Conference in Dallas was cautiously optimistic, mainly by reason of the generally *uniform resolve of fertilizer producers* to take whatever pricing and supply action is necessary to be profitable during the next fertilizer year.

*Noranda Report (NOR 408836),* attached as *Tab 6, Pltfs.' Jt.Opp.Aff.* [Emphasis in Plaintiffs' Brief].

Once again, we find this evidence to be indeterminate. In our view, the documents show nothing more than some recognition, on No-

randa's part, that the price increases were enduring.

Indeed, a similar recognition is reflected in contemporaneous issues of a weekly trade publication of the fertilizer industry, whose edition of June 15, 1987, reported as follows: "The resolve on PCS's and IMC's parts to hold out for higher product dollars is firm." "Market Watch, North America, Potash," *Green Markets*, June 15, 1987 at 2, attached as *Exhibit 21, Defs.' Jt.Rep.Aff.* In an issue of July 27, 1987, the same publication advised: "Potash producers have convinced most buyers that they are firmly committed to current posted prices, at least for the next couple of months." "Market Watch, North America, Potash," *Green Markets*, June 15, 1987 at 2, attached as *Exhibit 21, Defs.' Jt.Rep.Aff.* Given the acknowledged interdependence of the firms within the potash industry, and the unrebutted testimony of the Noranda employees, that the information contained in the internal reports was derived from potash customers, we conclude that the mere use of the terms "collectively," and "uniform," to describe the events that were occurring in the marketplace, does not competently allow a reasonable inference of conspiracy. See, *Deposition of David James Sandison* at 77–78, *Deposition of Julie Rawska–Cook* at 134, attached as *Exhibit 21, Defs'.Jt.Rep.Aff.*

In the final analysis, we are compelled to conclude that the Plaintiffs have failed to proffer evidence which constructively distinguishes conduct, that could not or would not have occurred without advance communication or understanding, and that which is an ordinary incident of the marketplace. We do not suggest that this evidence is somehow irrelevant, however, as the Second Circuit has observed, in *Apex Oil Co. v. DiMauro*, supra at 254–55, as follows:

A court deciding whether to grant summary judgment should not view each piece of evidence in a vacuum. Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place.

Accordingly, in determining those inferences that may be reasonably drawn from the Plaintiffs' showings, we have viewed, and will continue to consider, the Plaintiffs' evidence in the context of the Record as a whole.

d. *Interfirm Communications.* The third component of the evidence, which the Plaintiffs claim supports a reasonable inference of a conspiracy, consists of the communications between the various Defendants. According to the Plaintiffs, there existed a high level of interfirm communications which, when considered in conjunction with the Defendants' record of coinciding conduct, warrants an inference of conspiracy. For these purposes, we will follow the organization that the Plaintiffs have employed, and will group this evidence in the following categories: the cutoffs; the exchange of production information; the price discussions; the apologies; and the threats. Upon our close review, we conclude that these communications do not reliably confirm the Plaintiffs' allegations of conspiracy.

i. *The Cutoffs.* The Plaintiffs assert that, "among the most noteworthy communications," are those that relate to "cutoff dates." *Pltfs.' Jt.Opp.Memo.* at 16. The Record demonstrates that the Defendants have frequently announced future potash prices, and the dates when those prices were to take effect. According to the Plaintiffs, "the Defendants would follow up on price increase announcements with personal communications to make sure all competitors would adhere to the new price on the effective date and refrain from selling at the old price after the 'cutoff date.'" [25] *Id.* Upon

25. Robert Turner ("Turner"), who was the Vice–President of Sales at Kalium, described cutoffs, as they related to price changes, in the following terms:

There are generally four price periods in the fertilizer year. * * * One would be summer fill program, then you have the fall use period, then you have a winter fill program and a spring use period. Generally the prices in the fill programs are lower than prices in the use periods. So if we put our a price list for the summer fill program that is due to cut off on September 15, by means of the price list we say that product that is ordered and shipped after September 15 will go at a higher price. Our distribution system occasionally gets swamped and is unable to deliver all of the orders by September 15. So to make certain

close review, however, this grouping of communications generally relates to one producer—PCS—complaining about a certain business practice of another producer—Kalium.

In response to this contention, the Defendants have cited the Seventh Circuit's decision, in *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, supra at 661, and have asserted that the proof of complaints by competitors is an inadequate foundation to support a conspiracy claim. In contrast to this case, however, *Valley Liquors*, as well as *Monsanto Co. v. Spray–Rite Service Corp.*, supra, which is the case that was principally relied upon in *Valley Liquors*, involved allegations of an unlawful vertical agreement.[26] In *Monsanto*, the Supreme Court held that a conspiracy cannot be established merely by proof that a manufacturer terminated a distributor in response to dealer complaints. According to the Court, complaints about price cutters "are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals." *Id.* at 763, 104 S.Ct. at 1470.

Despite the fact that *Monsanto* and *Valley Liquors* involved vertical agreements, rather than the type of horizontal conspiracy alleged here, we conclude that the analysis of these Courts is generally instructive. In rejecting the notion that a Jury could infer the existence of a price-fixing agreement from the complaints of other distributors, the *Monsanto* Court made clear that, so long as the manufacturer made an independent business decision not to do business with a distributor, the fact that the manufacturer was aware of the other distributors' complaints was of no moment. Complaints alone, the Court observed, do not "tend[ ] to exclude

the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* at 764, 104 S.Ct. at 1470–71. In so concluding, the Court, in *Monsanto*, recognized that complaints between members of different market layers are often "unavoidable," and may even assure a more efficient distribution system. *Id.* While complaints between competitors at the same market level may not always have the same potential to improve the market, we do not believe that evidence of such complaints, standing alone, satisfies the Plaintiffs' burden in establishing a conspiracy. Since the focus of our inquiry is directed at whether two or more of the Defendants unlawfully agreed to fix prices, we find no responsible basis, nor any persuasive authority, upon which to conclude that such complaints should be accepted, without more, as indicia of a conspiracy, in order to discourage, or to remove such conduct, from the horizontal marketplace. We, therefore, turn to the complaints, and the responses they received.

On November 5, 1990, Turner, who was the Vice President of Sales at Kalium, met with Doyle and Smith, both of PCS. According to Turner's notations from that meeting: "They wanted to talk about our post-increase shipments[;] [c]auses problems with effective date of increases."[27] *Deposition of Robert Turner* at 107, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.* Of note, Turner's daybook entry reveals that he had advised Doyle and Smith that he was meeting them out of courtesy, that he did not feel that meeting with competitors really solved anything, and that he "would not discuss any pricing related items with them." *Id.* at 109; *Turner Daybook Entry (AK 005698)*, attached as *Tab 3, Pltfs.' Jt.Opp.Aff.* Regarding the post-cutoff dis-

---

that our customers are protected on their price, if they have accepted orders in by the cutoff date, prior to the cutoff date, we sometimes have to ship beyond the cutoff date. *Deposition of Robert Turner* at 25–26, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.;* see also, *Deposition of Clifford Kelly* at 242–43 (stating reasons why list prices usually increased during the growing season), attached as *Exhibit C, Kal.Rep.Aff.*

**26.** In contradistinction to horizontal agreements, or agreements between competitors at the same level in market structure, a vertical agreement exists between firms at different levels of the

market structure, such as between manufacturers and distributors.

**27.** While not cited in the Plaintiffs' Memoranda, the Record indicates that, in July of 1989, Doyle telephoned Turner to express his displeasure at Kalium's practice of shipping product, after a price cutoff, at pre-cutoff prices. *Deposition of Robert Turner* at 107, attached as *Pltfs.' Jt. Opp.Aff.; Summary of Competitor Communications* at 12, attached as *Tab 1, Pltfs.' Jt.Opp.Aff.* We have also considered the import of this communication in the analysis that proceeds in the text of this Report.

cussion, Turner "just saw it as a continuation of [Doyle's] line of bitching about that." *Deposition of Robert Turner* at 110–11, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.* Indeed, Doyle has testified that shipping product at fill season prices, after a use season price increase, was "a constant practice at Kalium." *Deposition of William Doyle* at 297, attached as *Tab J, Kal.Rep.Aff.* Thereafter, in August of 1991, Doyle again expressed his "displeasure" to Turner, that "Kalium continued to ship beyond a cutoff date." *Deposition of Robert Turner* at 36, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.; Summary of Competitor Communications* at 14–15, attached as *Tab 1, Pltfs.' Jt.Opp.Aff.* Although Doyle did not ask Kalium to stop the practice, he stated that PCS's information and studies "showed that Kalium's market share increased in the months following a cutoff date." *Id.* Significantly, Turner testified that he responded as follows:

> I repeated what I had told him on the prior occasion * * * that our distribution system at times became overwhelmed and we could—couldn't make the cutoffs as we would like to do but that was our system and that we would work to protect the business that we had and if we had to extend, we would. We would run our business.

*Deposition of Robert Turner* at 37, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.*

Undoubtedly, if one first were to assume the existence of a conspiracy, PCS's complaints and inquiries, concerning Kalium's cutoff shipments, would appear to be consistent with communications between conspirators.

However, as *Matsushita* explains, the Plaintiffs are required to supply evidence which tends to establish the conspiracy, and the Plaintiffs may not discharge their burden by simply assuming that a conspiracy was at play, and then force-fitting every scintilla of evidence into that assumption. Here, the cutoff evidence does not dispose toward the establishment of a conspiracy, because the evidence does not tend to exclude the equally probable inference of independent action and, indeed, we find the evidence to be more supportive of independent action. Not only does the contemporaneous record disclose Turner informing Doyle of Kalium's competitive intentions, but there is also no evidence that Doyle requested Turner to stop the post-cutoff shipments at pre-cutoff prices. *Deposition of Robert Turner* at 26 ("I can't recall that he demanded that we stop doing that."), attached as *Tab 52, Pltfs.' Jt.Opp.Aff.* More importantly, the Plaintiffs make no attempt to contradict the evidence that Kalium did not change its conduct in response to PCS's protests. *Deposition of William Doyle* at 326, attached as *Tab J, Kal.Rep.Aff.; Deposition of Robert Turner* at 272–73, attached as *Tab E, Kal.Rep.Aff.*[28]

The Plaintiffs next assert that Turner recognized the "importance of adhering to the previously announced price rises." *Pltfs.' Jt.Opp.Memo.* at 17. To support this assertion, the Plaintiffs reference a December 16, 1991 entry in Turner's daybook which reads, as follows:

> Bill Doyle called. Wanted to advise they were not going along with the Gromark

---

28. The enforcement of cutoffs, the Plaintiffs assert, also prevented potash resellers from accumulating potash inventories, prior to a price increase, for resale after the increase went into effect. In this respect, the Plaintiffs proffer a PCS internal Memorandum of March 9, 1989, which, at first blush, appears to support their view:

> We must get control back in the hands of the producers. * * * We must control inventories, to not beef-up at any specific locations, at the request of the operator/customer or sales manager in anticipation of a block sale. It is important that we get the word out on block sales. * * * We need to set a policy or at least send some indicator as to our thinking.

*PCS Memorandum (PC 024187),* attached as *Tab 2, Pltfs.' Jt.Opp.Aff.*

This evidence is indeterminate, however, for it shows nothing more than PCS's frustration over the conduct of potash wholesalers which impeded PCS's ability to sell product after a price increase. Further, the fact that Turner expressed a similar concern to Gillette, on January 15, 1992, is not probative of a conspiracy. See, *Deposition of Robert Turner* at 142 ("I also told him I was concerned about reseller activity after 1/31 at old prices."), attached as *Pltfs.' Jt.Opp.Aff.* Absent some showing that the content of these communications supports a reasonable inference of a conspiracy, a discussion between rivals, of a common marketing concern, cannot singularly suffice to exclude the real possibility that the competitors were acting, individually, in their own, respective, self interests.

program. Said Gromark had advised that we were. He said he was advised that IMC and Cominco were declining as well. I told him that we had agreed to be competitive at Gromark. We also fully intended to get the product out by 1/31 and to read my letter to the trade. I reminded him that the Gromark program was in response to reseller deliveries after cutoff and was directed to protect themselves from that.

*Deposition of Robert Turner* at 136, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.; Turner Daybook Entry (AK 006067)*, attached as *Tab 3, Pltfs.' Jt.Opp.Aff.*

In our view, this entry more plausibly supports an inference of independent action than of concerted effort.

The "letter to the trade," to which Turner adverted, was a cover letter that Kalium had attached to its price list of December 2, 1991, and that had been transmitted to its customers. In that letter, Kalium informed its customers that it "intend[ed] to complete all winter fill requirements on or before January 31, 1992." *Kalium Letter to Customers (AK 101545)*, attached as *Exhibit 23, Defs.' Jt. Rep.Aff.* Thus, Turner conveyed no information to Doyle that had not already been made public. What is perhaps more significant, however, is that, rather than "recognize the importance of adhering to a price increase," Turner not only informed Doyle that Kalium would be competitive, but confirmed that Kalium had satisfied Gromark's request, and had sold its potash at its lower, fill-season

price. *Deposition of Robert Turner* at 262–63, attached as *Tab E, Kal.Rep.Aff.*[29]

■ ii. *The Exchange of Production Information.* In support of a conspiratorial inference, the Plaintiffs next contend that the Defendants "regularly exchanged detailed information about each other's future production." *Pltfs.' Jt.Opp.Memo.* at 18. When examined closely, however, the Plaintiffs' evidence reflects no more than innocent conduct.

The first piece of evidence, that is offered to support the Plaintiffs' assertion, is a Memorandum of September 15, 1992, which was authored by C.S. MacKay ("MacKay"), who was the officer at Kalium in charge of production, and which was directed to John Huber ("Huber"), who became the President of Kalium in 1991. *Kalium Memorandum (AK 008221)*, attached as *Tab 3, Pltfs.' Jt.Opp.Aff.* This Memorandum recounts a meeting, on September 9, 1992, of the International Fertilizer Association ("IFA") Potash Working Party. Along with MacKay, representatives from PCS, IMC, the Canadian government, and four non-Canadian producers were in attendance. The Memorandum reveals that various producers, including IMC and PCS, disclosed production information. When viewed in context, however, the producers disclosed their production plans for 1992 and, because the parties did not report the amount of potash that each had already produced in 1992, the disclosures did not reveal how much more potash each intended to produce. Even if the producers had provid-

---

**29.** Likewise, evidence that, on December 19, 1991, Turner told Bo Thompson ("Thompson"), who was a representative of Potocan, which is a non-Defendant potash producer, that Kalium intended to have all of its deliveries completed by 1/31, is non-probative. Not only is Potocan not a Defendant in this action, but Kalium's intent to have deliveries completed by 1/31 had previously been expressed in a letter to its customers. *Deposition of Robert Turner* at 138, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.* Further, we find Turner's statement to Steve Gillette, who was the Manager of National Accounts at PCS, that Kalium intended to "make our cutoff date * * * with only a few mechanical exceptions," and that Kalium did not intend to "deviate from my letter to customers on the price list," to be equally non-probative. *Id.* at 142.

Lastly, while the vast majority of the Plaintiffs' "cut-off" evidence involves PCS and Kalium, PCA's Ripperger recalled one instance when Doyle asked him if PCA intended to implement a price increase that PCA had announced, and "that [PCA] not make sales at the old price after the effective date of the announced price increase." *Deposition of John Ripperger* at 216, attached as *Tab 43, Pltfs.' Jt.Opp.Aff.* Although Ripperger could not recall either the date of the conversation, or his specific response, he believed PCA "did what we wanted to do as far as running our business." *Id.* at 218. The Plaintiffs have pointed to no evidence to the contrary. Although we do not condone such conduct, absent evidence that either Kalium or PCA modified their behavior, we conclude that Doyle's remarks are inadequate, by themselves, to support the inference of a collusive agreement.

ed this information, it is not clear what use this information had on the alleged fixing of prices. Given the fact that more non-Defendants provided production information than did the Defendants, and that the information which IMC and PCS provided was solely limited to their 1992 production figures, we conclude that this Memorandum is insufficient to favor an inference of a conspiracy.

The Plaintiffs next point to a Kalium Memorandum of January 8, 1993, in which MacKay reports a Saskatchewan Mining Association ("SMA") "State of the Nation" meeting. *Kalium Memorandum (AK 108967)*, attached as *Tab 3, Pltfs.' Jt.Opp.Aff.* At these meetings, "each company reviews specific items such as safety, union problems or employee problems and it also includes future plans for shutdowns." *Deposition of John Huber* at 61, attached as *Tab 31, Pltfs.' Jt. Opp.Aff.* However, with respect to the information concerning future shutdowns, Huber testified that the producers disclosed only what each had publicly disclosed, *id.* at 62, and, according to Huber, the applicable union contracts required the producers to provide their employees with advance notice of mine shutdowns. *Id.* at 57. Any inference of conspiracy, that could be based upon the Defendants' participation at SMA meetings, is further mollified by the fact that the producers disclosed this information prior to the commencement of the alleged conspiracy.[30]

Although not cited in the Plaintiffs' briefs, the final piece of evidence that they offer, to demonstrate regular exchanges of sensitive information, is a January 20, 1993 entry from Turner's daybook. The entry reveals that William Ayers ("Ayers"), who was the Director of International Sales and Marketing at PCA, told Turner that "their production was at desired levels but extreme cold was causing salt to precipitate and was impacting production." *Deposition of Robert Turner* at

225, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.* Not only did Ayers fail to indicate any future production information, but this kind of communication between firms, concerning general production information, would seem to be a natural expression of legitimate business interests, which simply does not support an inference of a conspiracy to fix prices.

■ iii. *Price Discussions.* In this category of evidence, the Plaintiffs have assembled those price communications which they have not otherwise identified as pertaining to cutoffs, to threats, or to apologies. The bulk of these communications involve instances in which a representative of one of the Defendants attempted to verify an assertion, by a customer, that he had purchased potash, in a completed transaction, from another producer and at a particular price.

The Plaintiffs contend that the exchange of pricing information supplies significant evidence of a conspiracy. We note, however, that the cases upon which the Plaintiffs rely involved systematic and routine exchanges of pricing information. Thus, in *Morton Salt Co. v. United States,* 235 F.2d 573, 575 (10th Cir.1956), the presence of a "completely free exchange of pricing information," between the alleged conspirators, was not disputed. In that case, "[p]ricing information, keys and scales were sent to one another and any changes which were of interest to the other salt producers were communicated immediately." *Id.* Likewise, in *Rosefielde v. Falcon Jet Corp.,* 701 F.Supp. 1053, 1057 (D.N.J. 1988), the defendants' sales representatives "engaged in a regular exchange of price and other information." The exchanges routinely occurred during monthly telephone conversations, and included the product's base price at the "next available delivery." *Id.*

In contrast to the cases cited by the Plaintiffs, not only does the verification evidence

---

30. As additional evidence that the Defendants had disclosed sensitive material regarding their production capacity, the Plaintiffs cite a Kalium Memorandum in which MacKay recounts the events at a dinner meeting of the Saskatchewan Potash Producers Association. According to the Memorandum, MacKay attended the meeting to talk with representatives of the Canadian Government. *Kalium Memorandum (AK 616130),* attached as *Tab 3, Pltfs.' Jt.Opp.Aff.* Notwith-

standing the Plaintiffs' claim, that the Defendants exchanged information "which would have been closely guarded secrets between true competitors," *Pltfs.' IMC Memo.* at 7, the date of the Memorandum was February 18, 1986, which predates the alleged conspiracy by over a year and, therefore, related to a period of time that the Plaintiffs cite as one of intense competition within the potash industry.

here relate to completed transactions, but the evidence demonstrates that the contacts were neither coordinated nor systematic. See, *Summary of Competitor Communications,* attached as *Tab 1, Pltfs.' Jt.Opp.Aff.* Notwithstanding the Plaintiffs' bald assertion that the Defendants "discussed prices at every opportunity," the Record reveals no more than several dozen instances, during the period between April of 1987, through March of 1995, in which one Defendant requested another to verify the sale price of a past transaction. *Pltfs.' Jt.Opp.Memo.* at 37. Further, the vast majority of the contacts involved PCS.

As to PCS, the evidence reveals that it either initiated or received verification contacts, which ranged from less than a dozen per year with IMC, to no more than one or two during the entire period with Noranda. *Summary of Competitor Communications,* attached as *Tab 1, Pltfs.' Jt.Opp.Aff.* Moreover, contrary to the Plaintiffs' assertion, the evidence suggests that the Defendants were not always candid with each other and, at times, they refused to disclose the requested information. See, *Deposition of Gary Snyder* at 129 (responses "probably not" truthful), attached as *Tab 48, Pltfs.' Jt.Opp.Aff.; Deposition of Jerry Jackson* at 220 (noting

that Turner at Kalium told him that he was "not comfortable" verifying a certain price), attached as *Tab 32, Pltfs.' Jt.Opp.Aff.*

■ Of course, "the dissemination of price information is not itself a *per se* violation of the Sherman Act." *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975); accord, *Rosebrough Monument Co. v. Memorial Park Cemetery,* 666 F.2d 1130, 1137 n. 4 (8th Cir.1981); see also, *VI Areeda,* § 1422b at 134 ("[A] firm asking a rival for its price on a particular item or transaction and announcing an intention to match it may simply be articulating the obvious; [and a] traditional agreement cannot be inferred.")[31] Because the mere exchange of price information, without more, is not unlawful, the Plaintiffs must demonstrate that the price verifications were motivated by an anticompetitive intent and, indeed, caused injury to competition. *Rosebrough Monument Co. v. Memorial Park Cemetery,* supra at 1138.

Here, by contrast, the evidence does not reasonably support the inference that the disclosure of past transaction prices was undertaken with the purpose and effect of facilitating a greater coordination and stabiliza-

---

**31.** Although not cited by the Plaintiffs, independent research has drawn our attention to *United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), which, upon a first reading, gave us pause. There, under circumstances which bear a similarity to those before us, the Supreme Court concluded that the conduct of price verifications, within a concentrated industry, could give rise to liability, under Section 1 of the Sherman Act, even in the absence of an illegal agreement. In a concurring opinion, Justice Fortas took pains to assure that the decision would not be read as holding that the exchange of price information, even in an oligopoly, should be treated as a *per se* violation of the Sherman Act. *Id.* at 339, 89 S.Ct. at 513–14.

Consistent with the Plaintiffs' approach, the Defendants also have not addressed the ruling of the Court in *Container Corp.,* but have tacitly addressed that ruling by addressing a prior decision of the Court that *Container Corp.* left intact. See, *Cement Manufacturers Protective Association v. United States,* 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925) (recognizing the validity of exchanging pricing information *so as to* curtail arguably fraudulent client practices). Further, the Defendants have pointedly relied upon the Supreme Court's subsequent holdings, in *United*

*States v. United States Gypsum Co.,* 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978), and *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975), which implicitly adopted Justice Fortas' concurrence as the governing law.

We are satisfied that, even if the price verification activities of the Defendants were as systemic and pervasive as those suggested in *Container Corp.,* that decision has no continuing viability. Whatever vestiges of *Container Corp.* remained after the Court's subsequent decisions, in *Citizens* and *Gypsum,* would surely be eradicated by the Court's pronouncements in *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where, as here, sporadic price verifications have occurred, but were generated by the legitimate business purpose of assuring that a customer was not misleading a producer, as to the market value of potash, the circumstance of the price verification is ambiguous evidence of price fixing. Accordingly, the cases which we cite in the text of this Opinion are, in our view, reflective of the prevailing weight of authority.

tion of prices. In the two instances, that were cited by the Plaintiff, as involving a response by a Defendant to a specific price confirmation discussion, the Defendant actually lowered its price. *Deposition of Charles S. Hoffman* at 133, attached as *Tab 16, Pltfs.' Jt.Opp.Aff.*, cited in *Summary of Competitor Communications* at 7, attached as *Tab 1, Pltfs.' Jt.Opp.Aff.* As to intent, the unrebutted evidence supports an inference that the Defendants made, and answered inquiries regarding past transactions, in order to ascertain the accuracy of their customers' assertions. See, *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 527 (9th Cir. 1987) ("An exchange of price information which constitutes reasonable business behavior is not an illegal agreement."). We find nothing inherently unusual, or sinister, in a sporadic request being made to a business competitor, in order to determine if a customer's report, of a competitive sales price, was truthful.

Having concluded that the Plaintiffs' price verification evidence does not tend to exclude the possibility that the Defendants were acting independently, we turn to those price discussions which, the Plaintiffs assert, did not involve a price confirmation.

■ 1. *The NMP/Eddy Memoranda.* In support of their assertion, that the Defendants developed a network "to exchange advance information about price increases," the Plaintiffs cite an internal NMP/Eddy Potash Memorandum dated October 27, 1988. *Pltfs.' Jt.Opp.Memo.* at 19; *NMP/Eddy Memorandum (MN 001511)*, attached as *Tab 8, Pltfs. Jt.Opp.Aff.* The Memorandum states that, with respect to a recently scheduled Kalium price increase, "PCS and IMC have indicated they do not expect to change current prices before December 1." *Id.* The Plaintiffs infer that Pat Tubbs ("Tubbs"), who authored the Memorandum, and who was an NMP salesperson, had obtained the information from conspiratorial discussions with repre-

sentatives of PCS and IMC. We conclude, however, that this inference is speculative because the Memorandum does not disclose the means by which Tubbs secured the information. Indeed, the Memorandum plainly reveals, on its face, that Tubbs had obtained the Kalium price list—a portion of which was affixed to the document—from a customer. *Id.* Moreover, Dean McWilliams, who was the only witness who testified about the Memorandum, stated that the source of the information, that was contained in the document, was a customer. *Deposition of Dean McWilliams* at 84, attached as *Exhibit 24, Defs.' Jt.Rep.Aff.*

For the same reason, we find the remaining documents, that are cited in the Plaintiffs' Memorandum in Opposition to NMP/Eddy's Supplemental Memorandum, to be hopelessly ambiguous. For example, the Plaintiffs have referred to an internal Memorandum of January 30, 1992, in which Marshall observes that: "The primary Potash producers are making strong statements in regard to the February 1st price increase which is stated to be $7.00 according to the published list prices." Not only is Marshall's reference to "strong statements" unclear, there is nothing in the Record to support an inference that Marshall learned of these "statements" from his rivals. *NMP/Eddy Memorandum (MN 003549)*, attached as *Tab 8, Pltfs.Jt.Opp.Aff.* The Plaintiffs' attempt to brace this asserted inference, by citing a Memorandum of February 1, 1992, which was authored by McWilliams, and which stated that NMP/Eddy "will support prices effective February 1, 1992 as published in December," is equally unavailing. *NMP/Eddy Memorandum (MN 003549)*, attached as *Tab 8, Pltfs.Jt.Opp.Aff.* In fact, McWilliams testified that his intent was to report that NMP/Eddy was "going to make every effort to hold our price schedule." *Deposition of Dean McWilliams* at 116, attached as *Exhibit 5, NMP/Eddy Jt.Rep.Aff.*[32]

---

**32.** The Plaintiffs citation to an additional Memorandum, which was authored by Marshall, and dated December 3, 1992, is equally non-probative. The Memorandum, which has price lists from IMC and PCS appended to it, stated: "PCS is not increasing prices until Feb. 1, 1993." *NMP/Eddy Memorandum (001525)*, attached as

*Tab 8, Pltfs.Jt.Opp.Aff.* Once again, however, the manner in which Marshall obtained the information contained in the Memorandum is entirely unclear and, by every appearance, PCS's stated intent—not to raise its prices until February 1— was intimated on the face of its price list.

**2. *Jackson (PCS)—Benusa (Cominco)*.** Next, the Plaintiffs identify a meeting at which David Benusa ("Benusa"), who was a Regional Sales Manager at Cominco, asked Jackson to confirm a discounted price, that PCS had used in a sale to Crop Production Services ("CPS"), a subsidiary of Cominco. *Deposition of Jerry Jackson* at 63, attached as *Tab 32, Pltfs.' Jt.Opp.Aff.* According to Jackson, on behalf of Cominco's accounting department, Benusa wanted to know why CPS received a $6 discount. *Id.* at 68. Jackson testified that he informed Benusa that the discount constituted a "competitive national discount," which PCS had maintained with CPS prior to CPS's acquisition by Cominco. *Id.* at 65. According to the Plaintiffs, "[i]t defies all logic to believe this clandestine meeting was simply an effort to get information that the accounting people could have gotten from a simple call." *Pltfs.' Com.Memo.* at 4–5. Of course, whether the information requested by Benusa could be simply obtained from another source is as conjectural as the Plaintiffs' inference that Jackson and Benusa met for a conspiratorial purpose when there is an equally valid business reason to explain their encounter; namely, whether a subsidiary of Cominco was being properly charged for potash and whether that charge reflected a new price reverberation in the marketplace to which Cominco, and the other potash producers, might have to competitively respond. More importantly, there is no showing that Benusa sought any alteration in the discount given, or otherwise acted upon the information that Jackson disclosed.

**3. *Hoffman/Wittje (IMC)—Benusa (Cominco)*.** The Plaintiffs have also isolated an expense report of Steve Hoffman ("Hoffman"), who was the Senior Vice President of Sales at IMC, which records that he, Herman Wittje, who was also of IMC, and Benusa, played golf on July 8, 1992. *Hoffman Expense Report (MI 103147)*, attached as *Tab 4, Pltfs.' Jt.Opp.Aff.* The report advises that the purpose of the outing was to discuss IMC's potash exchange with Cominco and Canpotex. *Id.* According to Hoffman, IMC and Cominco had a detailed potash exchange that involved multiple warehouse ·locations. *Deposition of Steve Hoffman* at 194–97, attached as *Tab 29, Pltfs.' Jt.Opp.Aff.* Once a year, representatives from each company would determine valid locations for the exchange, and would agree on what had to be accomplished with any outstanding balances. Hoffman testified that the outing was planned for this purpose, and he denied that there was any discussion of potash pricing in the United States. *Id.* at 197–98.

In support of a purported conspiratorial purpose behind the golf outing, the Plaintiffs have directed us to an internal Cominco Memorandum, which was also dated July 8, 1992, in which Benusa states: "Our competitors have agreed to deduct $2.00 from their current warehouse and rail delivered list." *Pltfs.' Com.Memo.* at 7, quoting *Cominco Memorandum (CA 012296)*, attached as *Tab 7, Pltfs.' Jt.Opp.Aff.*[33] Notwithstanding Hoffman's testimony, the Plaintiffs infer, from the timing of the golf game, and of Benusa's Memorandum, that the information recited in Benusa's Memorandum was derived from conversations that were conducted on the golf course. However, absent any evidence as to who Benusa was referring to as the "competitors" or whether the price deduction was published before the golf outing, the inferences, that the Plaintiffs would have us draw, from the coincidence of the dates involved, cannot rise above pure conjecture.

**4. *Zalac (Noranda)—Conforti (IMC)*.** In an internal Noranda Memorandum of November 29, 1989, Mike Zalac reports that he was "[a]dvised by Bill Conforti, IMC today that PCS published following prices." *Noranda Memorandum (NOR 140117)*, attached as *Tab 6, Pltfs.' Jt.Opp.Aff.* The Memorandum concludes by stating that "IMC will be publishing same prices." *Id.* Although Conforti disclosed IMC's intent to match PCS's published prices, the unrebutted testimony of David Westlake ("West-

---

33. Unfortunately, we are unable to locate this document. Nevertheless, portions of the document's contents have been quoted in the Plaintiffs' Cominco Opposition Memorandum, during Hoffman's Deposition, and during the Summary Judgment Hearing. We have no cause to doubt the reliability of the contents there quoted. See, *Pltfs.' Com.Memo.* at 7; *Deposition of Steve Hoffman* at 195, attached as *Tab 29, Pltfs.' Jt.Opp.Aff.; Transcript of Summary Judgment Hearing* at 269.

lake"), from Noranda, confirms that the information, which pertained to IMC's pricing intentions, had previously been distributed in the marketplace. *Deposition of David Westlake* at 198–99, attached as *Tab 5, Noranda's Supplemental Reply Memorandum, Affidavit of Michael Kelly ("Nor.Rep.Aff.")*. Westlake testified that, prior to his receipt of the Memorandum, he had learned of IMC's plan to match PCS's price in a conversation that he had with a customer. *Id.* at 206–09; *Westlake Diary (NOR 481182)*, attached as *Tab 5, Nor.Rep.Aff.* This evidence offsets any intimation that Conforti had provided Zalac with pricing information as a part of some alleged conspiracy. Further undermining any conspiratorial inference is the fact that Zalac's responsibilities, at Noranda, did not include sales or pricing but, rather, involved transportation matters. *Deposition of David Westlake* at 45, attached as *Tab 5, Nor.Rep.Aff.*

5. *Turner/Huber (Kalium)—Ripperger (PCA)*. The Plaintiffs next underscore Ripperger's testimony that Turner once remarked, during a telephone conversation which took place in the 1990's that, "by going directly to customers," PCA was "messing up the market" in the Minnesota/Wisconsin region. *Deposition of John Ripperger* at 226, attached as *Tab 43, Pltfs.' Jt.Opp.Aff.* Turner has admitted that he was frustrated by the fact that a PCA salesman was "aggressively cutting the price," and that he asked Ripperger if he knew what his salesman was doing. *Deposition of Robert Turner* at 51, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.*

Despite Turner's frustration as to a particular pricing policy at PCA, we find this evidence to be equally consistent with independent conduct. Notably, there is no evidence that Turner, or Huber, who was the President of Kalium, had asked PCA to discontinue any particular sales practice. *Deposition of John Ripperger* at 227, attached as *Tab 43, Pltfs.' Jt.Opp.Aff.* While Ripperger responded that he would "check and get back" to Turner, the Record reveals that "[h]e never did, and the prices in Wisconsin continued to fall." *Deposition of Robert Turner* at 53, attached as *Tab 52, Pltfs.' Jt.Opp.Aff.* Corroboratively, Turner has testified that Rip-

perger did not provide any information about PCA's sales activities. *Id.* at 282, attached as *Tab E, Kal.Rep.Aff.* We are not impressed that any inference, founded upon this exchange, could be other than vague innuendo.

■ iv. *Apologies Between Rivals*. As a further aspect of its proffered evidence of interfirm communications, the Plaintiffs contend that "the Defendants politely apologized to each other for price competition." *Pltfs.' Jt.Opp.Memo.* at 20. Notwithstanding this characterization, we find that the proffered evidence is too slender to bear a reasonable inference of complicity.

On January 15, 1992, Steve Gillette, who was PCS's Manager of National Accounts, informed Turner that a particular bid, to a customer in the Pacific Northwest, had been a mistake. According to Gillette, Turner had "said something to the effect of what the heck happened on this Agra Northwest bid." *Deposition of Steve Gillette* at 151, attached as *Tab 25, Pltfs.' Jt.Opp.Aff.* Gillette explained that "people had been away for the holidays," and that a "misquotation had been made that was below common trading in the market." *Id.* Gillette testified to his concern that Sam Clark ("Clark"), who Turner supervised, had "come unglued." *Id.* at 152. Turner informed Gillette that "even though costly, [Kalium] had protected [its] business at that location." *Deposition of Robert Turner* at 142, attached as *Tab 52, Pltfs.' Jt. Opp.Aff.*

In December of 1992, Gillette encountered Clark at a Far West Fertilizer Conference. According to Gillette, Clark still appeared "miffed about what had happened in that respective bid." *Deposition of Steve Gillette* at 117, attached as *Tab 25, Pltfs.' Jt.Opp.Aff.* Gillette reiterated that a mistake had been made in the price quotation, and he further acknowledged that PCS had subsequently changed its organizational structure. *Id.* at 118. "The other thing that I did say to him, that I was going to pursue the market competitively every day and I had no intent of having a special price for bid business or two-tiered pricing in that geography." *Id.* Gillette recalls Turner advising that the bid price was particularly disruptive in the mar-

ketplace, but that Kalium did what they had to do, which was to match the price quotation. *Id.* at 119.

We believe that this single transaction, by itself, creates no permissible inference. The Record demonstrates that Gillette sought to assuage certain representatives of Kalium, who were upset at having to match a price that was "below the perceived market price." *Id.* at 119. Given the competing inferences and, particularly, the uncontroverted evidence that the objectionable price was a mistake, we find that Gillette's remarks do not tend to preclude the possibility of independent action and, in this instance, the end result was increased, rather than diminished, competition.

■ v. *Threats.* Lastly, the Plaintiffs assert that, when prices eroded in 1989, the "price communications became accusatory." *Pltfs.' Jt.Opp.Memo.* at 21. Since the bulk of this evidence does not involve instances in which one Defendant demanded another Defendant to behave in a certain manner, or risk peril, we conclude that, contrary to the Plaintiffs' characterization, this evidence more properly amounts to a collection of complaints. As we have already indicated, the mere fact that one Defendant has complained to another is ambiguous, since each of the specific complaints would appear to have an equally plausible, non-conspiratorial explanation. We turn to this evidence, following the Plaintiffs order of presentation.

1. *Childers (PCS)—Proops and Sullivan (Kalium).* In July of 1988, Childers visited Jay Proops ("Proops"), who, along with Joe Sullivan ("Sullivan"), had acquired Kalium from PPG in November of 1987. According to Proops, Childers told him that PCS was losing its market share, and that several other producers, including Kalium, were gaining market share. *Deposition of Jay*

**34.** Proops' testimony reveals that the document he received from Childers did not include the analysis of IMC and Cominco, which had been included in the original Memorandum. *Deposition of Jay Proops* at 46–47, attached as *Tab 41, Pltfs.' Jt.Opp.Memo.* We note that the original version, in addition to separate analyses of Cominco and IMC, also included the following summary:

*Proops* at 17, attached as *Tab 41, Pltfs.' Jt.Opp.Memo.* Childers further advised Proops that he had documentation to show that Kalium was "undercutting PCS's prices in the marketplace," and that such pricing "was one of the causes of the problem." *Id.* at 18. At the end of the meeting, Childers handed Proops a PCS Memorandum of June 16, 1988, which was authored by Jackson and directed to Doyle, and which was entitled: "Competitive Activity Spring 1988: IMC, Kalium and Cominco." In relevant part, the Memorandum reads:

> Kalium's history throughout the spring season has been non-supportive. The information provided will show Kalium has consistently been $6.00—$8.00/ton below PCS pricing through the spring season. * * * Freight has been a game Kalium has played throughout the spring season serving to reduce delivered market pricing. * * * Kalium's attitude in the marketplace has shown aggression and a lack of willingness to support Canadian list pricing. Even though Kalium has acted with less finesse than IMC and has clearly been a negative, their impact on the general market has not been as destructive as IMC.

*PCS Spring Competitive Analysis—Redacted (AK 057713A–B),* attached as *Tab 3, Pltfs.' Jt.Opp.Aff.*[34]

Thereafter, Proops undertook a study in order to determine whether the specific prices, that were reflected in that document, were correct. *Deposition of Jay Proops* at 37, attached as *Tab 41, Pltfs.' Jt.Opp.Memo.* While the Plaintiffs assert that Proops commenced this investigation so as to reassure himself that Kalium "had not been competing," *Pltfs.' Jt.Opp.Memo.* at 22, Proops has testified to the contrary. When asked what he was "looking to find out," Proops stated that it was his understanding that Kalium's

> PCS's May market share performance is a direct result of low priced selling from our chief competitors, IMC and Kalium. Market developments took several forms ranging from broker based activity to freight manipulation. The fact remains that IMC and Kalium have not come close to supporting the list price.
>
> *PCS Spring Competitive Analysis—Non–Redacted (PC 074283–85),* attached as *Tab 2, Pltfs.' Jt. Opp.Memo.*

position in the marketplace was "to sell a premium product at a premium price." *Deposition of Jay Proops* at 34, attached as *Tab 41, Pltfs.' Jt.Opp.Memo.* If the pricing allegations were true, "it would have been different from my understanding of our own policy." *Id.* at 32.

While we are troubled by Childers' conduct, we again note that the focus of the antitrust laws is concerted action. Here, the evidence shows that Proops was "upset" with Childers' visit, and that he had expressed his concern to Sullivan. *Id.* at 30; *Deposition of Joe Sullivan,* attached as *Tab 50, Pltfs.' Jt. Opp.Aff.* This concern is reinforced by the fact that Proops notified Kalium's legal counsel shortly after that meeting. In addition, Proops testified that he did not show the referenced document to anyone, other than Kalium's attorney and Sullivan, and that he did not discuss the results of the study with anyone other than Sullivan. See, *Declaration of Jay Proops* at ¶ 3, attached as *Tab M, Kal.Memo.Aff.* Further, the Record does not demonstrate that Childers asked Proops to modify Kalium's behavior, let alone that

Proops agreed to change Kalium's pricing policies, or even that he told Childers what Kalium's practice was with respect to its pricing policies. *Deposition of Jay Proops* at 18–22 and 29, attached as *Tab 41, Pltfs.' Jt.Opp.Memo.*

When viewed in totality, we find that Childers' visit, although perhaps injudicious, was insufficient, as a matter of law, to raise a genuine issue of fact. First, the content of this informal complaint does not suggest that Childers accused Kalium of deviating from agreed upon conduct but, rather, merely voices PCS's concern that Kalium's aggressive pricing policies had taken a portion of PCS's market share. Second, the Plaintiffs have identified nothing in the Record that even remotely suggests that Childers' visit had any effect on Kalium's pricing decisions. See, *Declaration of Jay Proops* at ¶ 3, attached as *Tab M, Kal.Memo.Aff.; Deposition of Joe Sullivan* at 172–73, attached as *Tab G, Kal.Rep.Aff.* Indeed, at least in PCS's view, Kalium continued to aggressively pursue a larger market share. In a PCS Memorandum of November 18, 1988,[35] in which Jack-

---

**35.** The November 18, 1988 follow-up Memorandum is significant in that it not only supports Kalium's claim, that its pricing did not change after Childers' visit, but it also suggests aggressive competition on the part of IMC, Cominco, and Noranda. In this regard, the Memorandum states:

> IMC has set the standard for market share since the beginning of the 1988 calendar year. * * * Market share strides have resulted once again from freight manipulation, below market pricing and low prices selling through third parties (brokers). Third party selling has produced the greatest market share gains for IMC.
> * * * * * *
> Cominco has missed very few opportunities to sell aggressively. * * * Although menacing, market aggression by Cominco was much less frequent and certainly not as wide spread as IMC and Kalium.
> * * * * * *
> Noranda through Terra showed absolutely no support for market pricing. As the fall market weakened Terra managed to remain $2.00 to $4.00/S.T. below competitive levels.
> * * * * * *
> PCS' chief competitors, IMC and Kalium, simply took advantage of PCS market discipline. * * * The lack of competitor discipline has had a snow-balling effect on market share. IMC and Kalium have noticeable market share increases as a result of the lack of support for market pricing.

*PCS Competitive Market Analysis (PC 171624),* attached as *Exhibit 30, Defs.' Jt.Rep.Aff.*
On December 13, 1988, Jackson summarized PCS's year from a market share perspective. The analysis was included in a Memorandum directed to Doyle, which concluded with the following language:

> When assessing the market share situation, it is clear that PCS losses this year result from competitor's low market selling, freight manipulation and terms in special situations. PCS has been very disciplined and has refused to sell under the above circumstances. Our chief competitors IMC, Kalium and Cominco have taken the "whatever it takes to get the business" selling approach.

*PCS 1988 Business Loss Analysis (PC 171619),* attached as *Exhibit 31, Defs.' Jt.Rep.Aff.*
In our view, the market analyses performed by PCS not only fail to support the Plaintiffs' alleged conspiracy, but they strengthen the Defendants' contention that their pricing activities were not concerted.

Lastly, the portrayal of Cominco's aggressive selling undermines the Plaintiffs' assertion that Cominco participated as a "teamplayer" in the conspiracy. *Pltfs.' Com.Memo.* at 7. To support this assertion, the Plaintiffs have pointed to the following statements in the PCS June Competitive Analysis Memorandum: "Very little of the information we have points to problems generated by Cominco. In a few instances Cominco was found to be below the market but their general

son follows up on the Memorandum of June, that Childers gave to Proops, Jackson states: "While PCS supported strong June/July pricing and strict guidelines for national accounts, Kalium priced product aggressively, forward—sold material, and appeared liberal with national discounts." *PCS Competitive Market Analysis (PC 171624)*, attached as *Exhibit 30, Defs.' Jt.Rep.Aff.* Thus, there is no causative relationship from which a reasonable inference of conspiracy may reliably be drawn. The Plaintiffs apparently ask us to infer, from Childers' comments, that he would not have approached Proops in the absence of a prior understanding. Given Proops' testimony, that he did not solicit the analysis, that he communicated no agreement, that he immediately contacted Kalium's counsel, and that Kalium's post-visit persistence in aggressively pricing its product, this inference is less compelling than the competing inference that Childers acted, independently, on the chance that he might receive a favorable response, which he did not.

Thereafter, on August 16, 1990, Childers made an attempt to discuss pricing with Sullivan. His attempt has been memorialized in a Memorandum that Sullivan drafted. See, *Sullivan Memorandum (AK 058790)*, attached as *Tab 3, Pltfs.' Jt.Opp.Aff.* The Memorandum reads, in part, as follows:

> Childers than turned to a second issue, stating that his pricing leadership was not working despite major efforts. He immediately said that he would like to discuss this issue with me, taking advantage of my long experience in industry leadership. He indicated he had been by to see me two years ago, but that was during the time that I was in the hospital * * *. I told him that, as much as I respected him, that we could not talk about pricing at all because even the appearance of this might be misconstrued by the Department of Justice, or other governmental bodies. I further pointed out that Jay [Proops] and I had decided, right from the start, never to engage in this kind of discussion. Childers

behavior pointed to responsible selling." *PCS Spring Competitive Analysis—Non–Redacted (PC 074283–85)*, attached as *Tab 2, Pltfs.' Jt.Opp.Aff.* Even without the follow-up market analyses,

responded that he wouldn't even suggest anything illegal in such a discussion.

> I responded that, even if it were totally innocent, several years down the line it might appear illegal. I again reiterated that I was not trying to be difficult or unfair, but we will just not discuss pricing at all. Childers then backed off and said he would not discuss it with us given our views.

Immediately after the conversation, the Record reflects that Sullivan consulted with Kalium's legal counsel and "alerted Kelly not to discuss anything remotely concerning price with Childers, feeling that this was a very dangerous situation." *Id.* What is most significant about this conversation, however, is that an attempt to discuss pricing was explicitly, and abjectly, rebuffed by Sullivan; thus an inference of concerted action is not justifiably supported. Viewed in conjunction with Childers' visit in June of 1988, Sullivan's conversation with Childers suggests that, at most, Childers sought an understanding with Kalium that it would be in each producer's best interests if prices were set and maintained. However, even if that had been Childers' intent, the Plaintiffs have identified no evidence, in the Record before us, that even remotely suggests Childers reached any "unity of purpose or a common design and understanding." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

2. *Doyle (PCS)/Williams (IMC)—Ripperger (PCA).* During his deposition, Ripperger recalled being approached by representatives of three potash producers—Doyle from PCS, Williams from IMC, and an individual from Dead Sea Works—concerning PCA's sale of Russian Potash. *Deposition of John Ripperger* at 204–11, attached as *Tab 43, Pltfs.' Jt.Opp.Aff.* These communications occurred during a meeting of the Fertilizer Institute ("TFI") in 1987, or in 1988. Each of these individuals informed Ripperger that PCA's pricing activity, in Florida, was "undermining the prevailing level of prices for

however, we conclude that PCS's use of the term "responsible selling" is nothing more than its unilateral characterization of price-following behavior.

potash," or was otherwise "having a negative impact on the market." *Id.* at 204 and 209. In view of Ripperger's testimony, that he perceived his communications with Doyle and Williams as annoyances, rather than threats, and that, despite these conversations, PCA continued to sell Russian potash at whatever price it felt was necessary, we find this evidence non-suggestive of any alleged conspiracy. *Id.* at 209–210 (annoyance); *Id.* at 253 (no change in behavior), attached as *Tab A, Rio Algom/PCA Rep.Aff.*

3. *Doyle (PCS)—Huber (Kalium).* During a meeting, in 1991, of the Phosphate and Potash Institute ("PPI"), Doyle complained that Kalium's market share had increased and PCS's had declined over a period of time. *Deposition of John Huber* at 250, attached as *Tab 31, Pltfs.' Jt.Opp.Aff.* In response, Huber advised that Kalium was enjoying increased intercompany sales, and good industrial sales. *Id.* at 251. This evidence proves nothing.

Doyle then expressed unhappiness about PCS's drop in market share with Occidental Chemical, which was a customer of both Kalium and PCS. Doyle told Huber that "he wasn't going to kick us [i.e., PCS] out," and indeed, PCS matched Kalium's lower price to maintain business. *Deposition of William Doyle* at 275–76, attached as *Tab 22, Pltfs.' Jt.Opp.Aff.* In turn, Huber testified that he considered Doyle's comments as "trash talk," and that Doyle was unhappy and frustrated that Kalium's market share had risen. *Deposition of John Huber* at 254, attached as *Tab 31, Pltfs.' Jt.Opp.Aff.* Moreover, since Kalium had previously signed a long-term contract with Occidental, Doyle's complaints could not, as a matter of logic, have had any effect upon Kalium's pricing. Further delimiting any reasonably plausible inference of a conspiracy is the fact that, once Doyle began commenting on Kalium's aggressive pricing with respect to a specific customer, Huber told Doyle the meeting was over, and he promptly left. *Id.* at 251.

4. *Doyle (PCS)—Turner (Kalium).* On January 12, 1993, Doyle telephoned Turner to verify reports of Kalium offering "terms" in certain locations. *Deposition of Robert Turner* at 152, attached as *Pltfs.' Jt.Opp.Aff.*

According to Turner's notations of the conversation, Doyle "admonished me that [PCS] did not and would not give terms." *Id.* In reply, Turner advised that Kalium had met a competitive situation, but would not disclose the identity of the customer. *Id.* With respect to terms, Turner replied that Kalium would "protect [its] business." *Id.* In light of Turner's responses, we find that, rather than demonstrate concerted action, this exchange fully supports an inference of independent action.

5. *Snyder (PCS)—Ayers (PCA).* A PCA Memorandum of February 4, 1993, records a conversation between William Ayers ("Ayers"), who was PCA's Director of International Sales and Marketing, and Gary Snyder ("Snyder"), who was PCS's Account Manager. *PCA Memorandum (XC 120955)*, attached as *Tab 5, Pltfs.' Jt.Opp.Aff.* During that conversation, Snyder asked Ayers why he had offered a certain price to a specific customer which, in Snyder's view, was well below the market in that area. The Memorandum notes that Ayers replied that it was none of Snyder's business. In turn, Snyder told Ayers that PCS "will take it (prices) down and bury you (PCA) if that's what you want." *Id.* According to the Memorandum, Ayers recognized that Snyder was intoxicated, and he suggested to Snyder that his comments were inappropriate. *Id.*

At the outset, we note that this appears to be the only instance in this Record where one Defendant "threatened" another. Nevertheless, we do not believe that this conversation supports a reasonable inference of concerted action. Ayers testified that he did not perceive Snyder's remark as a threat but, instead, he sensed that Snyder was inebriated and "just mad they lost that business." *Deposition of William Ayers* at 83, attached as *Exhibit 26, Defs.' Rep.Aff.* Significantly, the evidence before us is undisputed, that the PCA employee rebuffed the complaint, and reported the incident to his supervisor. While we do not view threats, even if "idle," to reflect an exemplary business practice, we must examine the threat, in context, before we can reasonably infer a conspiracy from its existence. We find no legitimate basis to infer, on this Record, that a solitary threat,

which was effectively rebuffed, reliably supports an inference of conspiracy.

6. *Jackson (PCS)—Ripperger (PCA).* On February 18, 1993, Jackson asked Ripperger if PCA was selling at a certain price, and if PCA was following "the announced price increases." *PCA Memorandum (XC 120954),* attached as *Tab 5, Pltfs.' Jt.Opp.Aff.* In response, Ripperger refused to comment, and stated that it was not in their best interests to discuss the matter. Ripperger also stated that PCA was "competitive with prices we find in our various markets." *Id.* We find no basis upon which to conclude that this evidence supports an alleged conspiracy.

7. *Zimmerman (Cominco)—Ripperger (PCA).* On February 22, 1993, Ben Zimmerman, who was a District Manager at Cominco, telephoned Ayers, at PCA, to determine whether PCA was selling potash at a certain price in a particular market. *PCA Memorandum (XC 120959),* attached as *Tab 5, Pltfs.' Jt.Opp.Aff.* Ayers refused to comment, to which Zimmerman replied that he thought he would attempt to determine what was happening from the marketplace. We find this evidence wholly non-probative of any allegedly illegal conduct.

8. *Cominco Unwillingness to Trade Potash With PCA.* The Plaintiffs next reference a Cominco internal Memorandum of February 22, 1993, as further evidence of a "threat." Although this Memorandum confirms a willingness, on the part of Cominco, to initiate a potash exchange with PCA, the Plaintiffs highlight that portion of the document which states that, "[d]ue to their weak approach to pricing, I am not prepared to offer them other locations at this time." *Cominco Internal Memorandum (CA 009838),* attached as *Tab 7, Pltfs.' Jt.Opp.Aff.* The Plaintiffs urge that Cominco's refusal to engage in additional trades with PCA is evidence of retaliation, or punishment. *Pltfs.' Jt.Opp.Memo.* at 23–24. In our view, the Memorandum is ambiguous, for it is wholly unclear what the author intended by referring to PCA's "weak approach to pricing." While such language could imply a conspiratorial effort to coerce PCA to raise its prices, it could equally mean that Cominco was not interested in permitting PCA to sell Cominco-derived potash at below market prices—an undeniably cogent business reason for Cominco, independently, to reject any contemplated potash exchange.

■ e. *Internal Memoranda Evidence.* While not labeled a plus factor, the Plaintiffs identify several internal Memoranda, which were obtained from the various Defendants, and which, the Plaintiffs claim, support a conspiratorial inference. Upon closer examination, however, we find that the Memoranda reflect nothing more than mere interdependence.

i. *Cominco.* The Plaintiffs cite several occasions on which a Cominco employee expressed the importance of "supporting" a particular price increase. For example, on February 17, 1992, Benusa recommended that Cominco publish a new price list, that would be effective on February 15. The Plaintiffs' maintain that the statement that, "[w]e have support from the coop system and I believe other majors are prepared to support this pricing structure," reveals a conspiratorial inference. *Cominco Memorandum (CA 010350),* attached as *Tab 7, Pltfs.' Jt. Opp.Aff.* We are not so persuaded. There is no evidence that Cominco communicated with any other Defendant concerning the February 15 price increase. Indeed, Benusa testified that the information, which pertained to the other potash producers, was obtained from a customer. *Deposition of David Benusa* at 78, attached as *Tab 16, Pltfs.' Jt.Opp.Aff.* Likewise, we find the Plaintiffs' evidence that Cominco decided, on several occasions, to "support" a particular price increase, reflects nothing more than its recognition that a price-following policy was, at least as of that date, in its best interest. See, *Cominco E-mail, dated September 5, 1991 (CA 309789)* ("need to make sure we are making every effort to support this price increase"); *Cominco E-mail, dated October 16, 1992 (CA 012468)* ("we have to support these levels without deviating"); *Cominco Memorandum, dated January 25, 1994 (CA 004068)* ("Our dealer network advised us that Kalium has announced a $8.00 per ton price increase on potash effective 2/14/94[;] * * * [i]t appears that we will support this increase but will wait a couple of days before we

announce."), attached as *Tab 7, Pltfs.' Jt. Opp.Aff.*

In addition, the Plaintiffs assert that Cominco's central role in the alleged conspiracy is demonstrated by Benusa's statements, in an internal Memorandum of January 29, 1990, that Cominco "intend[s] to be a stabilizing rather a disruptive force," and that to "approach the market in any other way would be economically and *politically* unwise." *Pltfs.' Com.Memo.* at 6–7; *Cominco Memorandum (CA 013758),* attached as *Tab 7, Pltfs.' Jt. Opp.Aff.* [Emphasis added in the Plaintiffs' briefing]. By emphasizing the term "politically" in their written arguments, the Plaintiffs appear to claim that Benusa used that term to reference Cominco's conduct in relation to the alleged co-conspirators. When the Memorandum is read in context, however, the term "politically" takes on its literal meaning, and most probably refers to Governmental actors. For example, the Memorandum advises:

> Given our current supply situation and our relationship with other buyers in the market place (i.e. CF) we should not * * * accept returns that may put us in violation of the suspension agreement. * * * I can assure you that we have no intention of violating the spirit of the agreement.

*Id.*

Moreover, the Plaintiffs suggestion of a conspiratorial meaning is further undercut by the fact that, positioned between the quoted statements concerning Cominco's stated intent to be "stabilizing," Benusa wrote: "We will be a player in the market based on service, quality and price to the extent that we can." *Id.* A fair reading of this statement, in conjunction with the entirety of the Memorandum's contents, logically implies the absence of an illegal agreement—not the presence of one.

ii. *PCA.* As suggestive evidence of PCA's participation in the alleged conspiracy, the Plaintiffs have isolated a statement, which was recited in a PCA internal Memorandum of October 25, 1989, and which relates that a particular pricing program "may have some effect on moving product and stabilizing market." *PCA Memorandum (XC 119822),* attached as *Tab 5, Pltfs.' Jt.*

*Opp.Aff.* The program is specific to a particular "pricing problem at Baltimore since late May." *Id.* Despite the Plaintiffs' urging to the opposite effect, we draw no conspiratorial inference from this Memorandum. The reference to "stabilizing" is ambiguous, at best, since the term is plainly susceptible to multiple meanings. Here, the Memorandum appears to make clear that PCA intended to lower its prices, in order to sell more potash. We are unwilling to subscribe a conspiratorial inference to such a legitimate exercise of independent business judgment.

The Plaintiffs also rely upon a portion of a Monthly Report in November of 1992, which Robert Connochie, who was the President of PCA, sent to PCA's parent, Rio Algom, as evidencing that PCA acted contrary to its economic self-interest. The quoted portion states:

> In our effort to stabilize prices and maximize 1993 profit PCA has deliberately turned down business. As a result November volumes were minimal; December will be better but still below average.

*PCA Monthly Report (XC 201661),* attached as *Tab 5, Pltfs.' Jt.Opp.Aff.*

The Plaintiffs contend that PCA's decision not to maximize sales reflects economic irrationality. The Plaintiffs' reliance on this document is misplaced, however, as it demonstrates, on its very face, that PCA's intent was to "maximize 1993 profit."

iii. *Noranda.* In similar fashion, the Plaintiffs contend that language in an internal Noranda Memorandum of June 27, 1987, which recommends that Noranda "support PCS's leadership role and announce to their [price] levels," is suggestive of a conspiracy. *Noranda Memorandum (NOR 407467),* attached as *Tab 6, Pltfs.' Jt.Opp.Aff.* We disagree. In our view, the Memorandum reveals no more than independent price-following behavior. The author informs that she had advocated following PCS's published prices, as opposed to other producer's prices, because she believed that those producers would later revise their price lists. *Id.* Accordingly, we find ample evidence of interdependence to

offset the Plaintiffs' implication of illegally concerted conduct.

f. *Summary.* In assessing the individualized components of the Plaintiffs' proffered evidence of price fixing, we have not lost sight of the greater picture for, in truth, the whole can be greater than the sum of its individual parts. Here, however, we have the totality of the Plaintiffs' evidentiary showings, but that composite view can claim no synergistic enhancement "from a number of acts none of which" tend to exclude the real possibility of independent action. *Cal. Computer Products v. Intern. Business Machines,* 613 F.2d 727, 746 (9th Cir.1979); see also, *American Floral Serv. v. Florists' Transworld Del.,* 633 F.Supp. 201, 215 n. 23 (N.D.Ill.1986) ("[I]t requires no sophistication in mathematical theory to recognize that zero plus zero plus zero still equals zero[;] * * * [i]f no incident has probative value, all incidents taken together have no probative value."). While, perhaps, unduly simplistic, we believe it to be cryptically straightforward that, notwithstanding our thorough vetting of this Record for a showing which would comport with the rudiments of "Simon-says," we have found nothing more than "Follow-the-Leader."

Nor does the Plaintiffs' case obtain added substance from the expert opinion evidence of Rausser—not because he is without the requisite background in economic theory, but because his opinions can be no more reliable than the factual underpinnings upon which they have been predicated. With modest exception, the mere passage of an untrustworthy evidentiary showing, through the mechanism of an expert's Report, will be wholly unavailing in curing the foundational deficiencies. See, *Rule 703, Federal Rules of Evidence.* In voicing his opinions, Dr. Rausser has necessarily accepted, as reasonable,

the ambiguous showings that *Matsushita* regards as nonprobative. We may not do likewise.

We understand the Plaintiffs' earnest belief that the conduct of the Defendants is, in their view, wholly consistent with their allegations of illegal price fixing. Unfortunately, while those allegations might properly elude a Motion to Dismiss, at this stage of the proceedings, the Plaintiffs may no longer rest on their allegations, for the Court must look, as we have, to the evidence before it in a light—prismatically focused by the doctrine of *Matsushita*—most favorable to them. See, *Behrens v. Pelletier,* —— U.S. ——, ——, 116 S.Ct. 834, 840, 133 L.Ed.2d 773 (1996). Here, the result of that deliberative review commends an award of Summary Judgment to the Defendants.

**B.** *The Separate Summary Judgment Motions of Individual Defendants.*

While our Recommendation, if adopted, would have the effect of summarily concluding the Plaintiffs' claims, in the interests of completeness, we briefly address the Motions of Rio Algom and PPG for the entry of Summary Judgment on independent grounds.[36]

As we have noted, Rio Algom's involvement in the alleged conspiracy arose from its ownership of PCA. As a result, in order to hold Rio Algom liable, the Plaintiffs must either pierce the corporate veil between Rio Algom and PCA, or demonstrate that Rio Algom participated "as an actor," in the alleged conspiracy. *H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531, 1549 (8th Cir.1989).

In support of their assertion, that Rio Algom is "legally responsible for the antitrust violations by PCA," the Plaintiffs

---

**36.** While the majority of the Plaintiffs' claims are timely, those claims, which arise more than four years before this action was commenced, require proof of fraudulent concealment if they are to remain viable. See, *Title 15 U.S.C. § 15b* ("[a]ny action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action was accrued."). As the District Court has previously explained, "[t]he doctrine of fraudulent concealment requires plaintiffs to show (1) defendants concealed the conduct complained of and (2) despite the exercise of due diligence, plaintiffs failed to discover the facts that form the basis of their claim." *In re Potash Antitrust Litigation,* 159 F.R.D. 682, 698–99 (D.Minn.1995). Nevertheless, since we have found that an inference of conspiracy is not reasonable, there cannot be a concealment of that which does not exist. Accordingly, we do not reach the Defendants' Statute of Limitations defense.

highlight the language, in an internal PCA business strategy document, which is dated in August of 1990, and which states that "Rio Algom's March 30, 1990 strategy paper outlines several issues which form guidelines for PCA strategy." *Pltfs.' Rio Algom/PCA Opp. Memo.* at 5; *PCA Memorandum (XC 03958),* attached as *Tab 5, Pltfs.' Jt.Opp.Aff.* The Plaintiffs underscore that PCA supplied Rio Algom with monthly summaries of its operations, see, e.g., *August 1990 Report (RIO 4124),* attached as *Tab 5, Pltfs.' Jt.Opp.Aff.,* and that Rio Algom representatives had participated in the merger negotiations between Kalium and PCA. *Deposition of Robert Connochie* at 170, attached as *Tab 18, Pltfs.' Jt.Opp.Aff.* As additional evidence to find Rio Algom liable, the Plaintiffs identify an internal PCA organizational chart which lists PCA as a "division" of Rio Algom. *April, 1990 PCA Organizational Chart (XC 035579),* attached as *Tab 5, Pltfs.' Jt.Opp.Aff.*

Nevertheless, in order to hold Rio Algom liable "as an actor," the Plaintiffs must demonstrate that Rio Algom "performed acts sufficient to create liability, or actively influenced [PCA] in its violations." *H.J., Inc. v. International Tel. & Tel. Corp.,* supra. In contrast, the Plaintiffs' evidence does not indicate that Rio Algom influenced any purportedly conspiratorial conduct. Indeed, the guidelines referred to in the cited strategy document concerned the environment, new investment, professional development, and the volatility of earnings from mining investments. *PCA Memorandum (XC 03958–61),* attached as *Tab 5, Pltfs.' Jt.Opp.Aff.* As in *H.J.,* which involved a claim of below-cost, predatory pricing, "there [has been] no proof that [the Parent corporation] was involved in the decisions upon which liability is based." *H.J., Inc. v. International Tel. & Tel. Corp.,* supra.

■ The Plaintiffs' claim, for piercing Rio Algom's corporate veil, is equally without merit. First, evidence that Rio Algom received monthly summaries from PCA, and that it participated in a merger discussion between PCA and Kalium, reveals nothing more than a normal parent-subsidiary relationship and, therefore, such conduct cannot, legitimately, constitute a basis for making

Rio Algom responsible for PCA's independent, corporate actions. See, e.g., *Lowell Staats Mining Co. v. Pioneer Uravan, Inc.,* 878 F.2d 1259, 1264 (10th Cir.1989). Moreover, under these circumstances, a corporation's inaccurate description, of its relationship with a related corporation, cannot justify piercing the corporate veil. See, e.g., *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1460 (2d Cir. 1995) (statements describing subsidiary as a division and as a business unit not evidence that the two companies operated as a "single corporate entity"). In sum, the Plaintiffs have failed to demonstrate " 'the substantial reasons' necessary to disregard the presumption that a subsidiary is a legally separate entity from its parent." *H.J., Inc. v. International Tel. & Tel. Corp.,* supra, quoting *Contractors, Laborers, Teamsters & Engin. v. Hroch,* 757 F.2d 184, 190 (8th Cir.1985) (substantial reasons to justify veil piercing involve undercapitalization, failure to follow corporate formalities, intermingling of finances, promotion of fraud or illegality, and sham existence to shield liability); see also, *Cooper v. Lakewood Engineering and Mfg. Co.,* 874 F.Supp. 947, 955–56 (D.Minn.1994) (similar factors cited under Minnesota law), aff'd, 45 F.3d 243 (8th Cir.1995). Accordingly, we find no basis to hold Rio Algom accountable, even if PCA had engaged in price complicity, as the Plaintiffs have alleged.

■ With respect to PPG, the defense of nonliability is premised upon its claim that it withdrew from the purported conspiracy when it sold Kalium, in November of 1987. Since the Plaintiffs did not file this action within four years of that date, PPG maintains that the Plaintiffs' claims are barred on Statute of Limitations grounds. We find this argument to have merit.

A conspiracy "is presumed to exist until there has been an affirmative showing that it has terminated, and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *United States v. Edwards,* 994 F.2d 417, 421 (8th Cir.1993), cert. denied, 510 U.S. 1048, 114 S.Ct. 701, 126 L.Ed.2d 667 (1994), quoting *United States v. Lewis,* 759 F.2d 1316, 1343 (8th Cir.1985), cert. denied 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985). Ac-

cordingly, "the statute of limitations does not begin to run on a co-conspirator until the final act in furtherance of the conspiracy has occurred or until a co-conspirator withdraws from the conspiracy." *United States v. Reed,* 980 F.2d 1568, 1584 (11th Cir.1993), cert. denied, 509 U.S. 932, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993).

In *United States v. United States Gypsum Co.,* 438 U.S. 422, 464, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978), the Supreme Court stated: "[a]fffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." While the mere cessation of activities may not be sufficient to activate the period of limitations, a conspirator "need not take action to stop, obstruct or interfere with the conspiracy in order to withdraw from it." *United Sates v. Lowell,* 649 F.2d 950, 957 (3rd Cir.1981); see also, *United States v. Granados,* 962 F.2d 767, 773 (8th Cir.1992) (citation omitted) (To withdraw from a conspiracy, a conspirator "must take affirmative action, either making a clean breast to the authorities or communicating his withdrawal in a manner reasonably calculated to reach co-conspirators.").

Based upon the Record before us, we conclude that, by selling its interest in Kalium, PPG not only severed its connection with the potash industry, but it did so in a manner that was reasonably expected to adequately notify all of the alleged co-conspirators. The record reveals that the sale of Kalium, by PPG, was widely publicized in trade and financial publications, including *Green Markets* and the *Wall Street Journal.* Indeed, the unrebutted testimony of the salespersons, and of the executives, from all of the alleged co-conspirators, confirms their knowledge that PPG had sold Kalium. See, *Portions of Deposition Testimony,* attached as *Exhibit 8, PPG's Memorandum in Support of Motion for Summary Judgment, Affidavit of Kathryn M. Walker ("PPG Memo.Aff.").*

The Plaintiffs assertions to the contrary are not persuasive. First, the Plaintiffs argue that this Court's prior recommendation, that denied PPG's Motion to Dismiss, under Rule 12(b)(6), Federal Rules of Civil Procedure, controls our ruling on PPG's present Motion. Of course, the argument is frivolous, at best, for it hopelessly ignores the core distinctions between the respective dispositive Motions. As the Supreme Court recently reiterated, Motions to Dismiss are directed to the sufficiency of the allegations in the Complaint, whereas, on Motions for Summary Judgment, the Court looks to the evidence before it. *Behrens v. Pelletier,* supra at ——, 116 S.Ct. at 840. Moreover, the case upon which the Plaintiffs' rely, for the proposition that a sale of a business does not effect a withdrawal—*United States v. Sax,* 39 F.3d 1380 (7th Cir.1994)—is distinguishable. Admittedly, the defendant in *Sax* sold his drug distribution business, but the evidence disclosed that the payment for that business was contingent upon future drug sales, and further, that he continued to receive proceeds from those drug sales. *Id.* at 1387. In contrast, it is uncontroverted that PPG never sold potash, or received any financial benefit from the sale of potash, after the date that Kalium was sold. See, *Affidavit of Aziz Giga* at ¶¶ 4-5, attached to *PPG Memo.* Indeed, this case is more in line with our Court of Appeals decision in *Krause v. Perryman,* 827 F.2d 346 (8th Cir.1987). There, the Court concluded that, by producing unrebutted evidence that he had "sold all his stock and resigned as president of [the conspiring enterprise]," the defendant in a civil RICO case was entitled to Summary Judgment on the ground that he had effectively withdrawn from the conspiracy. *Id.* at 351. Therefore, we can find no basis, on the Record before us, to impute Kalium's involvement in the alleged conspiracy to PPG.

For these reasons, we recommend that Rio Algom's and PPG's Motions for Summary Judgment be granted, even if the Court should reject the Recommendation that Summary Judgment be granted in favor of all of the Defendants.

WHEREFORE, It is—

RECOMMENDED:

1. That the Motion of PCA and Rio Algom for Summary Judgment [Docket No. 512] be granted.

2. That Kalium's Motion for Summary Judgment [Docket No. 516] be granted.

3. That Noranda's Motion for Summary Judgment [Docket No. 519] be granted.

4. That Cominco's Motion for Summary Judgment [Docket No. 522] be granted.

5. That the Joint Motion of the Defendants for Summary Judgment [Docket No. 525] be granted.

6. That IMC's Motion for Summary Judgment [Docket No. 527] be granted.

7. That PPG's Motion for Summary Judgment [Docket No. 530] be granted.

8. That the Motion of New Mexico Potash and Eddy Potash for Summary Judgment [Docket No. 534] be granted.

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than September 30, 1996,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than September 30, 1996,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.